No









NO. 12-07-00428-CR

 

IN THE COURT OF APPEALS 

 

TWELFTH COURT OF APPEALS DISTRICT

 

TYLER, TEXAS

REX LEE
WILLIAMS,                                     §                  APPEAL FROM
THE 241ST

APPELLANT

 

V.                                                                      
§                   JUDICIAL DISTRICT COURT

 

THE STATE OF TEXAS,

APPELLEE                                                     §                    SMITH COUNTY , TEXAS

                                                                                                                                                            

MEMORANDUM
OPINION

Rex
Lee Williams appeals his conviction for aggravated assault with a deadly
weapon.  On appeal, Appellant raises four issues.  We reverse and remand.

 

Background

Appellant
was charged by indictment with aggravated assault, a second degree felony.[1] 
More specifically, the indictment alleged that Appellant (1) Aintentionally, knowingly,
or recklessly cause[d] serious bodily injury to Scott Goodwin by striking with
hand and striking with knife and striking with sharp object;@ (2) Aintentionally, knowingly or
recklessly cause[d] serious bodily injury to Scott Goodwin by striking with
hand and striking with knife and striking with sharp object, and . . .
did then and there use or exhibit a deadly weapon, to-wit: hand and knife and
sharp object, during the commission of the assault;@ and (3) Aused
or exhibited a deadly weapon, to-wit: hand and knife and sharp object in the
manner of its use and intended use was capable of causing death and serious
bodily injury, during the commission of or immediate flight from said offense.@ Appellant pleaded Anot guilty,@ and the matter proceeded
to a jury trial.








At
trial, L. C. Kirkpatrick stated that, on the evening of the incident, he and
Appellant went to Rick=s
On The Square in Tyler, Texas. According to Kirkpatrick, he and Appellant
consumed alcohol. Around midnight, they left Rick=s
and, as they were walking to a car, Aa
couple of guys@ in a
group of other people began yelling in their direction. Kirkpatrick did not
know the men or what they were yelling, but stated that the men were yelling in
a negative, aggressive tone. Appellant walked across the street to determine
why the men were yelling at them. Kirkpatrick stated that after Appellant
confronted the men, a fistfight began. Kirkpatrick ran toward Appellant in an
attempt to break up the fight. As he did so, a man tackled him and, within
seconds, Kirkpatrick’s assailant was joined by at least two other men.
Kirkpatrick testified that he was on the ground trying to protect his face
while being hit, kicked, and stomped, but believed he could not protect
himself.  Suddenly, the attack stopped. Although he testified that he sustained
a severe injury, he also stated that he did not go to the emergency room, an
emergency clinic, or a doctor for his injuries. 

Appellant
testified that as he walked across the street toward the men yelling at him, he
and the men exchanged words. At least two of the men walked toward him.  Someone
to Appellant’s left, whom he later assumed was Goodwin, hit him in the face.
Appellant stated that he attempted to defend himself, but fell onto his back on
the ground after being Abulldozed@ by Goodwin and another man. 
While both men were hitting him, Appellant saw “out of [his] peripheral vision”
that Kirkpatrick was being kicked and beaten by three or four men. According to
Appellant, he immediately became concerned about what was going to happen to
Kirkpatrick and pleaded with Goodwin to get off him.  Goodwin did not comply.
Appellant then pulled his knife from his pocket, opened it, and showed it to
Goodwin. Appellant stated that he and Goodwin began fighting and wrestling for
the knife when a friend of Appellant=s
pushed Goodwin off him. Appellant picked up the knife, ran over to Kirkpatrick
with the knife open, and tried to scare the men beating Kirkpatrick by yelling
at them to get off Kirkpatrick or he would kill them. Then, Appellant noticed
Goodwin running toward him Aat
a full sprint.@ He testified
that he believed he only stabbed Goodwin once.  But he also testified that Athings were going so fast@ that he could have stabbed
him again. According to Appellant, he was in fear of death or serious bodily
injury for both himself and Kirkpatrick. 








Scott
Goodwin testified that on the night of the incident, he was at Rick=s for a bachelor party.  He
remembered that one of his friends offered to buy a round of drinks, but could
not recall anything else that occurred that night. He stated that his next
memory was of being in the hospital, but also stated that he was on so much
medication that he could not really determine his next memory. According to
Goodwin, he was in the intensive care unit for forty-two days on a fentanyl[2]
drip and morphine followed by an immobilizer drug for the next two weeks.
He was also in rehabilitation. Goodwin stated that every muscle in his left leg
was severed to the bone, and that he was stabbed in the back, chest, and
stomach.

After
the trial concluded, the jury found Appellant guilty of aggravated assault with
a deadly weapon as charged in the indictment, and assessed his punishment at
eight years of imprisonment.[3]  This appeal
followed.

 

Opinion Testimony

In
his second issue, Appellant contends that the trial court erred in permitting the
investigating detective to state his opinion about whether Appellant was acting
in defense of a third person or in self‑defense when he stabbed Goodwin.  He
argues that the detective=s
opinion involved the ultimate issue in the case. The State contends that
Appellant=s “ultimate
issue” objection is no longer a valid objection and that his hearsay objection
was not a proper objection to an expert=s
opinion testimony.  Appellant does not challenge the State’s characterization
of the detective as an expert.

Standard
of Review








A
trial court's decision to admit or exclude evidence is reviewed under an abuse
of discretion standard.  See Rodriguez v. State, 203 S.W.3d 837,
841 (Tex. Crim. App.2006); Montgomery v.  State, 810 S.W.2d 372,
390‑91 (Tex. Crim. App.1990).  The trial court is in the best position to
decide questions of admissibility, and we will uphold a trial court's decision
to admit or exclude evidence if it is Awithin
the zone of reasonable disagreement.@
 Rodriguez, 203 S.W.3d at 841.  We cannot reverse a trial court’s
admissibility decision solely because we disagree with it.  Id.  If
the trial court's ruling on the admission of evidence is correct under any
theory of law, the trial court's decision should not be disturbed, even if the
trial court gives the wrong reason for its ruling. See Romero v.
State, 800 S.W.2d 539, 543 (Tex. Crim. App.1990).

Applicable
Law








Testimony
in the form of an opinion or inference otherwise admissible is not
objectionable because it embraces an ultimate issue to be decided by the trier of
fact.  Tex. R. Evid. 704. Consequently,
an objection that an expert=s
testimony invades the province of the jury is no longer valid. Ortiz v.
State, 834 S.W.2d 343, 348 (Tex. Crim. App. 1992). Testimony that
merely embraces an ultimate issue is clearly admissible under rule 704. Duckett
v. State, 797 S.W.2d 906, 920 (Tex. Crim. App. 1990), overruled on
other grounds, Cohn v. State, 849 S.W.2d 817, 819 (Tex. Crim.
App. 1993).  Further, a lay witness may offer an opinion on an ultimate issue. Ex
parte Nailor, 149 S.W.3d 125, 135 (Tex. Crim. App. 2004). However, an
expert may not state a legal conclusion, Hernandez v. State, 772
S.W.2d 274, 275 (Tex. App.BCorpus
Christi 1989, no pet.), or give an opinion as to the truth or falsity of other
testimony. Taylor v. State, 774 S.W.2d 31, 34 (Tex. App.BHouston [14th Dist.] 1989,
pet. ref=d). If a
trial court permits an expert to give his opinion about whether he believed a
complainant was telling the truth or could be believed, that testimony not only
embraces the ultimate issue, but crosses the line from assisting the
trier of fact to replacing that body as decision maker. Duckett,
797 S.W.2d at 920.

Analysis

Detective
Chuck Barber, an eighteen year veteran detective with the Tyler Police
Department, testified that he was the investigator for the incident in
question. His role was to ensure that statements were obtained from witnesses
and that evidence was collected and documented. On cross examination, Detective
Barber testified that he believed Kirkpatrick was Afortunate to not get more injured since he had
three or four or five individuals beating on him.@
On redirect examination, he stated that Kirkpatrick did not suffer serious
bodily injury. Then, the State asked Detective Barber if he was Atelling the ladies and
gentlemen of the jury that you believe that the defendant acted out of self–defense
of [Kirkpatrick] or himself?@
Appellant objected that the State=s
question was a jury question and not for the detective to determine, but the
trial court overruled his objection. Detective Barber then testified that he
did not believe Appellant acted out of defense of Kirkpatrick.  

Defense of
a Third Person








A
witness may not testify whether he thinks a complainant can be believed because
such testimony replaces the trier of fact as decision maker. See id. 
Moreover, defense of a third person is an issue of fact to be determined by the
jury. See Saxton v. State, 804 S.W.2d 910, 913-14 (Tex. Crim.
App. 1991). Here, Appellant testified, in part, that he was acting in defense
of a third person, Kirkpatrick, when he stabbed Goodwin.  However, Detective
Barber testified that he did not believe Appellant acted in defense of Kirkpatrick. 
This is, in effect, a statement that Appellant’s testimony could not be
believed.  Thus, Detective Barber’s answer crossed the line from assisting the
jury to replacing the jury as decision maker. See Duckett, 797
S.W.2d at 920. Therefore, the trial court=s
decision to admit Detective Barber=s
opinion testimony regarding whether Appellant acted in defense of a third
person was outside the zone of reasonable disagreement. See Rodriguez,
203 S.W.3d at 841.

Harm
Analysis

But
a determination that error occurred is only one part of the analysis. The
erroneous admission of Detective Barber=s
opinion testimony was nonconstitutional error.  See Solomon v. State,
49 S.W.3d 356, 365 (Tex. Crim. App. 2001). Nonconstitutional error that does
not affect the substantial rights of the defendant must be disregarded. Tex. R. App. P. 44.2(b). Substantial
rights are not affected by the erroneous admission of evidence if the appellate
court, after examining the record as a whole, has fair assurance that the error
did not influence the jury, or had but a slight effect. Motilla v. State,
78 S.W.3d 352, 355 (Tex. Crim. App. 2002). In conducting a harm analysis, an
appellate court should consider everything in the record, including any
testimony or physical evidence admitted for the jury's consideration, the trial
court's instructions to the jury, the state's theory, any defensive theories,
closing arguments, and even voir dire, if material. Motilla, 78
S.W.3d at 355‑56; Morales v. State, 32 S.W.3d 862, 867 (Tex. Crim. App. 2000). Other factors to be considered are the nature of the evidence
supporting the verdict, the character of the alleged error, and how the
evidence might be considered in connection with the other evidence in the case.
Motilla, 78 S.W.3d at 355; Morales, 32 S.W.3d at
867. Whether the state emphasized the error can also be a factor. Motilla,
78 S.W.3d at 356.








The
record shows that whether Appellant acted in defense of a third person or in
self–defense was the pivotal issue in the case. The record shows further that
all but one of the witnesses (Jeffrey Freeman) had been drinking alcohol, and
some admitted to being intoxicated.  Some of the witnesses were involved in at
least one of the fights that occurred.  Consequently, the witnesses’ accounts
of the incident were, for the most part, incomplete and somewhat inconsistent. 
As such, the jury’s evaluation of witness credibility was especially critical. 


Appellant
testified at trial, and much of his testimony is uncontroverted.  Appellant described
two fights that occurred simultaneously on the night of the incident:  one
involving Appellant, Goodwin, and another man, and one involving Kirkpatrick
and three or four other men.  Appellant stated that, while Goodwin was on top
of him, he saw that Kirkpatrick was being kicked and beaten by three or four
men.  He testified that two and maybe three times he told Goodwin to “[g]et off
me.  My buddy is getting stomped over there.”  When Goodwin would not get off
him, Appellant pulled his knife out of his pocket, opened it, and showed it to
Goodwin.  They fought over the knife until Dustin Hanson, a friend of
Appellant’s, pushed Goodwin off Appellant.  Appellant then ran over to
Kirkpatrick and, in an effort to scare the men who were beating Kirkpatrick, he
displayed his knife and yelled at the men that he would kill them if they did
not get off Kirkpatrick.  He then noticed Goodwin running toward him “at a full
sprint.”  Appellant admitted that he stabbed Goodwin once, but conceded that he
could have stabbed him again.  

Appellant
related that his primary concern was what would happen to Kirkpatrick if he had
to fight Goodwin instead of going to Kirkpatrick’s aid.  Appellant stated further
that he also considered what might happen to him and that he thought both he
and Kirkpatrick were in danger of death or serious bodily injury.  

Two
of Kirkpatrick’s attackers, Christopher Freeman and Steve Dale Akin, admitted
that they Ajumped@ Kirkpatrick, threw him to
the ground, and hit and kicked him.  Freeman testified that Appellant picked up
his knife, held it to Goodwin=s
throat, and threatened to kill him if he moved.  He also confirmed that while
Appellant was threatening Goodwin, Kirkpatrick was still on the ground.  This
is consistent with Appellant’s statement that the attack on Kirkpatrick did not
end until after he stabbed Goodwin.  However, Freeman and Akin both testified
that Appellant never approached them with a knife or told them to stop beating
Kirkpatrick.

Dustin
Hanson, who had pushed Goodwin off Appellant, related his observations.  Hanson
testified that when he started to leave the downtown area, he heard arguing
going on behind him.  As he backed up his car, he noticed that Kirkpatrick was
surrounded by “about five or six guys.”  He then got out of his car and noticed
for the first time that Appellant and Goodwin were “going at it.”  As Hanson
went toward Kirkpatrick, he stopped just long enough to push Goodwin off
Appellant.  He testified that he never saw any other person fighting Appellant
and did not hear Appellant asking Goodwin to get off him.   He admitted,
however, that he did not see the beginning of the fight and that his attention
was on other people after he pushed Goodwin off Appellant.  Hanson stated further
that he did not get to Kirkpatrick until the fight, which he characterized as
lasting only “seconds,” had “basically stopped.”  He then saw Goodwin run by
him followed by Appellant, who was holding a knife and “cussing back and
forth.”  Hanson interpreted these acts as threatening toward Goodwin. Hanson recounted
that he never saw Appellant approach Kirkpatrick or Kirkpatrick’s attackers. 
When asked whether he thought it was reasonable to stab anybody, Hanson
replied, “Not at all.”  He also expressed his opinion that stabbing Goodwin did
not appear to him to be the only way Appellant could have helped Kirkpatrick.  He
stated further that he did not believe Kirkpatrick was in danger of death or
serious bodily injury.

Three
people testified that Appellant was in a good mood at Rick=s and they did not hear or
see him making threats.  Two other people testified that while they were at
Rick’s before the incident, Appellant told them several times that if someone
messed with his friend, he would kill that person.  Appellant showed them a
knife, and one of the witnesses stated that Appellant said he would stab them. 
Jeffrey Freeman testified that after the stabbing, he saw Appellant growling in
Goodwin=s face as
Goodwin was sitting, wheezing.  Freeman also testified that when another person
attempted to prevent Appellant from leaving after the incident, Appellant
threatened to kill him too. 








Based
upon our review of the record, including the above testimony, we note that neither
Appellant nor any other witness testified that Goodwin participated in the
attack against Kirkpatrick or that Goodwin committed any act which indicated
that Kirkpatrick needed protection from Goodwin.  To the contrary, the
testimony of Appellant, whose account of the incident was the most complete,
suggests that Goodwin’s attack and subsequent threatening actions were focused solely
on Appellant. However, Appellant testified that he was afraid Kirkpatrick could
be either killed or seriously injured by the men who were “stomping” him.  He
further stated that he knew that “if I’m fighting with [Goodwin], then I’m not
saving my friend.”  Consequently, he stabbed Goodwin to avoid becoming engaged
in a second fight with him.  

Detective
Barber’s testimony that he did not believe Appellant acted in defense of a
third person undercuts this defensive theory, but has some support in the
record.  The State presented evidence of Appellant’s threatening comments
before the incident and his aggressive behavior afterward.  However, the
testimony most damaging to Appellant’s position was that of Dustin Hanson.  Hanson
contradicted Appellant’s account of the incident as to the sequence of events
leading up to Goodwin’s stabbing, the characterization of Goodwin as the
aggressor immediately prior to the stabbing, and the imminence of death or
serious bodily injury to Kirkpatrick.  Moreover, Hanson’s testimony supports
Detective Barber’s opinion.

More
problematic, however, under the facts presented here is that by stating that he
did not believe Appellant acted in defense of a third person (Kirkpatrick),
Detective Barber communicated that he did not consider Appellant believable. 
In light of the multiple credibility issues in this case, the jury could have
given undue weight to Detective Barber’s assessment of Appellant’s credibility because
he was a neutral witness and had reached his conclusion based on the
investigation he conducted.  We note further, however, that the State elicited
the challenged testimony on redirect examination and did not ask Detective
Barber to elaborate further.  Nor did the State emphasize Detective Barber=s testimony in closing
argument.  Instead, the prosecutor merely referred to Appellant’s asserted
defense of Kirkpatrick as a “cockamamy story” and something that Appellant
“cook[ed] up.”  If believed, Hanson’s testimony supports this characterization.


The
admission of Detective Barber’s opinion testimony is troubling.  But after
considering the testimony in light of the whole record, and based upon the
foregoing analysis and the applicable standard of review, we have more than a fair
assurance that the error in admitting the testimony did not influence the jury
or had but a slight effect on its verdict. See Motilla, 78 S.W.3d
at 355. Therefore, even though the trial court erred, we cannot conclude that Appellant
has established the level of harm necessary to require reversal.  

Self-Defense

Appellant
also complains that Detective Barber was erroneously permitted to express an
opinion about whether Appellant acted out of self–defense when he stabbed
Goodwin.  On direct examination, the following exchange occurred between the
prosecutor and Detective Barber:

 

[PROSECUTOR]:  Are you telling the ladies and
gentlemen of the jury that you believe that the defendant acted out of
self–defense of L.C. Kirkpatrick or himself?

 

[APPELLANT’S COUNSEL]:  Objection.  I’m going to
object.  That’s going to be a jury question.  That’s not for Detective Barber
to determine.

 

THE COURT:                       Overruled.

 

[WITNESS]:                         Do I believe that
the defendant acted out of self–defense for L.C.?

 

[PROSECUTOR]:                Yes.

 

[WITNESS]:                         No, sir, I don’t.

 

[PROSECUTOR]:                What about for himself?

 

[WITNESS]:                         For himself?

 

[PROSECUTOR]:                Yes, sir.  I mean, let me
back up and phrase it this way. . . .

 

 

Then,
the State asked Detective Barber who walked over to Goodwin and his friends. Appellant
objected to the question, stating that any answer would be hearsay because Detective
Barber was not present at the incident and his testimony would be taken from
other persons’ statements. The State rephrased the question, and Appellant did
not object to the rephrased question. The State then asked Detective Barber a
series of questions, which ended with the detective’s admission that even after
Appellant came to the police station, gave an interview, and provided DNA
swabs, Appellant was still arrested.  The State does not disagree with
Appellant that by this testimony, Detective Barber communicated that he did not
believe Appellant acted in self–defense when he stabbed Goodwin.

As
a prerequisite to presenting a complaint for appellate review, the record must
show that the complaint was made to the trial court by a timely request,
objection, or motion that stated the grounds for the ruling that the
complaining party sought from the trial court. Tex. R. App. P. 33.1(a)(1). Further, the record must show
that the trial court ruled on the request, objection, or motion, either
expressly or implicitly, or refused to rule on the request, objection, or
motion, and the complaining party objected to the refusal. Tex. R. App. P. 33.1(a)(2).  Here,
after Appellant objected to the question as eliciting hearsay, the State offered
to rephrase the question, which the trial court allowed. Appellant did not object
to the rephrased question or any other question in the series.  Therefore,
Appellant has waived this complaint. See Tex. R. Civ. P. 33.1.

Conclusion

The
trial court’s error in allowing Detective Barber to testify that he did not
believe Appellant acted in defense of a third person was harmless.  Moreover, Appellant
waived his complaint regarding the State’s question regarding the admission of
Detective Barber’s opinion on whether Appellant acted in self–defense.  Accordingly,
Appellant=s second
issue is overruled.

 

Prior Inconsistent Statement

In
his third issue, Appellant argues that the trial court erred in prohibiting the
cross examination of Detective Barber to show that he had made a prior
inconsistent statement.  The State contends that the statement complained of is
hearsay and does not fall within any exception to the  hearsay rule.

Applicable
Law

The
Sixth Amendment provides in pertinent part that Athe
accused shall enjoy the right . . . to be confronted with the witnesses against
him.@ U.S.
Const. amend. VI. The right to confront opposing witnesses necessarily
includes the right to cross examine. Davis v. Alaska, 415 U.S. 308, 315‑16, 94 S. Ct. 1105, 1110, 39 L. Ed. 2d 347 (1974).  Cross
examination serves three general purposes: (1) it may serve to identify the
witness with his community so that independent testimony may be sought and
offered concerning the reputation of the witness for veracity within that
community; (2) it allows the jury to assess the credibility of the witness; and
(3) it allows facts to be brought out that tend to discredit the witness by
showing that his testimony in chief was untrue or biased.  See Alford
v. United States, 282 U.S. 687, 691‑92, 51 S. Ct. 218, 219, 75 L.
Ed. 624 (1931). The right to cross examine witnesses includes the right to
attack their general credibility or to show their possible bias, self–interest,
or motives in testifying.  Hammer v. State, No. PD–0786–08, 2009
WL 928561, at *4 (Tex. Crim. App. Apr. 8, 2009).  “The possible animus, motive,
or ill will of a prosecution witness who testifies against the defendant is
never a collateral or irrelevant inquiry, and the defendant is entitled,
subject to reasonable restrictions, to show any relevant fact that might tend
to establish ill feeling, bias, motive, interest, or animus on the part of any
witness testifying against him.”  Billodeau v. State, 277 S.W.3d
34, 42-43 (Tex. Crim. App. 2009).  The right of confrontation is violated when
appropriate cross examination is limited. Carroll v. State, 916
S.W.2d 494, 497 (Tex. Crim. App.1996) (plurality opinion) (citing Hurd v.
State, 725 S.W.2d 249, 252 (Tex. Crim. App.1987)).








A
witness’s prior inconsistent statement is admissible for purposes of
impeachment, and not as substantive evidence of the truth of the matters stated.
Staley v. State, 888 S.W.2d 45, 49 (Tex. App.BTyler 1994, no pet.)
(citing Aranda v. State, 736 S.W.2d 702, 707 (Tex. Crim. App.
1987)); see also Lawhon v. State, 284 S.W.2d 730, 730 (Tex. Crim.
App. 1955); Pope v. Stephenson, 774 S.W.2d 743, 745 (Tex. App.—El Paso 1989), writ denied, 787 S.W.2d 953 (Tex. 1990). In other words,
the prior statement may not be used to prove any substantive fact at issue in
the trial, but must be used solely to demonstrate self–contradiction by the
witness. Peter T. Hoffman, Texas Rules of Evidence Handbook 656-57 (8th
ed. 2008-09). Therefore, these prior statements are not hearsay. See 1
Steven Goode, et al, Guide to the Texas
Rules of Evidence § 613.2 (3d ed. 2002); see also Tex. R. Evid. 801(d) (“‘Hearsay’ is a
statement, other than one made by the declarant while testifying at the trial
or hearing, offered in evidence to prove the truth of the matter asserted.”).  The
rule of admissibility of prior inconsistent statements should be liberally
construed, and the trial court has the discretion to receive any evidence that
gives promise of exposing a falsehood. Staley, 888 S.W.2d at 49.

Analysis








As
noted above, Detective Barber previously testified that he did not believe
Appellant acted in self–defense or in defense of a third person. Based on the
State=s question,
Appellant proposed  asking Detective Barber if Ain
[his] interview with [Appellant], did he consistently maintain hisBthat he was acting out of
self–defense and defense of a third person?@
Appellant also proposed asking Detective Barber if Aduring his interview with [Kirkpatrick] did he
make the statement to Kirkpatrick that >enough
of your story matches what I already know. [Appellant] has already told the
truth, and that=s all
that matters.=@ In response, the State
argued that anything Appellant would have told Detective Barber would be Arank@ hearsay, and that Appellant had not pointed
to any applicable hearsay exception. The trial court sustained the State=s objections. 

Regarding
the first question, the trial court found that Appellant would be proffering
statements of Appellant through Detective Barber and, thus, his testimony would
be hearsay. As to the second question, the trial court found that Detective
Barber would be stating his opinion about whether Appellant told the truth. In
a bill of exception, Detective Barber testified that during the course of a
recorded interview, Appellant maintained that he acted in self–defense and in defense
of a third person. He also testified that in a recorded interview with
Kirkpatrick, he said, AOkay.
Enough of your story matches what I already know. [Appellant] has already told
the truth, and that=s
what matters.@ 

Limitation
of Cross Examination

Appellant=s proposed questions were
for the purpose of impeaching Detective Barber=s
previous testimony. See Staley, 888 S.W.2d at 49.  In answer to
Appellant=s questions
in the bill of exception, Detective Barber admitted that he told Kirkpatrick in
a recorded interview that he believed Appellant told the truth in his interview.
 But the detective testified at trial that he did not believe Appellant acted
in defense of a third person and implicitly expressed his opinion that he did
not believe Appellant acted in self–defense.  Thus, his testimony directly
contradicted his prior statement to Kirkpatrick.  

Jurors
are entitled to have the benefit of the defense before them so that they can
make an informed decision regarding the weight to be given the witness’s
testimony.  Maxwell v. State, 48 S.W.3d 196, 199 (Tex. Crim. App. 2001).  Appellant=s
cross examination about his statement to Kirkpatrick would have allowed the
jury to more completely assess Detective Barber=s
credibility, and to draw inferences relating to the reliability of his
testimony. See Alford, 282 U.S. at 691-92, 51 S. Ct. at 219.
Because Detective Barber’s trial testimony contradicted his prior statement to
Kirkpatrick, and Appellant=s
proposed questions properly served the purposes of cross examination, the trial
court erred in limiting Appellant’s cross examination of Detective Barber.[4]
 See id.; Staley, 888 S.W.2d at 49.

 

Harm
Analysis

Improper
limitation of cross examination violates the confrontation clauses of both the federal
and state constitutions and is subject to a constitutional harm analysis. U. S. Const. amend. VI; Tex. Const. art. I, § 10; Tex. R. App. P. 44.2(a); Love v.
State, 861 S.W.2d 899, 904 (Tex. Crim. App. 1993).  Although Appellant argues
that the trial court’s error in limiting the cross examination of Detective
Barber violated the Texas Constitution,
he does not provide any separate argument or authority explaining how the
protections offered by the Texas Constitution differ from the protections guaranteed by the United States Constitution.  Likewise,
Appellant does not argue that the Texas Constitution sets
out a different or higher standard than the federal constitution. Consequently,
the state claims raised by Appellant are waived,
and we review only his federal claims. See Moore v. State, 935 S.W.2d 124, 128 (Tex. Crim. App. 1996); Lawton  v. State, 913 S.W.2d 542, 558 (Tex. Crim. App.
1995), overruled on other grounds, Moseley v. State, 983
S.W.2d 249, 263 (Tex. Crim. App. 1998).  Because a violation of the right to
cross examination under the Confrontation Clause necessarily means that the
testimony was not permitted before the fact finder, we apply a three pronged
test in our review of the exclusion of such evidence. Shelby
v. State, 819 S.W.2d 544, 547 (Tex. Crim. App. 1991) (citing Delaware
v. Van Arsdall, 475 U.S. 673, 684, 106 S. Ct. 1431, 1438, 89 L.Ed.2d
674 (1986)); Smith v. State, 236 S.W.3d 282, 294 (Tex. App.‑Houston [1st Dist.]  2007, no pet.). 








In
conducting the required harm analysis, we first assume that the damaging
potential of the cross examination was fully realized.  Shelby,
819 S.W.2d at 547 (citing Van Arsdall, 475 U.S. at 684, 106 S. Ct. at 1438); Smith, 236 S.W.3d at 294.  Second, with that assumption
in mind, we analyze the error in connection with the following factors: (1) the
importance of the witness's testimony to the state’s case; (2) whether the
testimony was cumulative; (3) the presence or absence of evidence corroborating
or contradicting the witness's testimony on material points; (4) the extent of
cross examination otherwise permitted; and (5) the overall strength of the
prosecution's case. See Shelby, 819 S.W.2d at 547 (citing Van
Arsdall, 475 U.S. at 684, 106 S. Ct. at 1438); Smith, 236
S.W.3d at 294. Finally, in light of the first two prongs, we determine the
effect of the error.  See Tex. R.
App. P. 44.2(a); Shelby, 819 S.W.2d at 547; Smith,
236 S.W.3d at 294.  As we stated in our discussion of Appellant’s first issue, nonconstitutional
error is harmless unless it affects the substantial rights of the defendant.  See
Tex. R. App. P. 44.2(b).   And
substantial rights are not affected if, after examining the record as a whole,
we have fair assurance that the error did not influence the jury, or had but a
slight effect.  See Motilla, 78 S.W.3d at 355. When we review
constitutional error, however, the standard is more stringent.   In conducting
such a review, we must reverse a judgment of conviction or punishment unless we
determine beyond a reasonable doubt that the error did not contribute to the
conviction or punishment.  Tex. R. App.
P. 44.2(a).

As
we begin our analysis, we first assume that the jury was fully informed that (1)
in his interview with Detective Barber, Appellant consistently maintained that
he had acted in self–defense and in defense of a third person, and that (2) Detective
Barber told Kirkpatrick that his story matched what the detective “already [knew],”
and that “Appellant [had] already told the truth[.]”  See Shelby,
819 S.W.2d at 547 (citing Van Arsdall, 475 U.S. at 684, 106 S.
Ct. at 1438); Smith, 236 S.W.3d at 294.  In other words, we are
required to assume in our analysis that Detective Barber’s statement to
Kirkpatrick was before the jury.   With this assumption in mind, we apply the
five Van Arsdall factors to the record before us. See Shelby,
819 S.W.2d at 547 (citing Van Arsdall, 475 U.S. at 684, 106 S. Ct. at 1438); Smith, 236 S.W.3d at 294. 

1. 
The importance of Detective Barber=s testimony to the State’s case. Detective
Barber=s testimony was
important to the State’s case because he was the investigating detective.  His
role was to insure that statements were taken from any witnesses as soon as
possible after the incident and that the evidence was documented and
collected.  In this role, he could be considered a neutral witness.

At
trial, Detective Barber described his investigation.  He mentioned the names of
several people who were with Appellant at the time of the incident and told the
detective that Appellant had stabbed Goodwin.  He also informed the jury that,
in his experience, if a person has committed “some form of offense or a crime,
they don’t typically come and seek the police out to tell us about it.  They
flee and try to stay concealed.”  He then identified persons he had to “seek
out,” including Kirkpatrick and Appellant. He testified that he was unable to
“get ahold” of Kirkpatrick and obtain a statement from him until approximately
a month after the incident. Detective Barber also testified that he conducted a
“fairly extensive” interview of Appellant during which Appellant admitted he
stabbed Scott Goodwin.  The State asked Detective Barber whether he believed
that Appellant acted in defense of Kirkpatrick, and Detective Barber said that
he did not.  In response to a series of questions, Detective Barber also stated
that he interviewed Appellant and that Appellant was arrested thereafter.  The
questions were asked after Appellant objected to Detective Barber’s being
questioned by the State regarding whether he believed Appellant stabbed Goodwin
in self–defense.  In this context, the implication of his reference to
Appellant’s ultimate arrest after the interview is that Detective Barber did
not believe Appellant acted in self–defense.    

Appellant
testified and gave his version of the incident.  Although the testimony of
several witnesses cast doubt on some of the details Appellant recounted, the
most damaging testimony came from Dustin Hanson.  Hanson was Appellant’s friend,
and had pulled Goodwin off Appellant during the fight Appellant described in his
testimony.  Hanson testified, in part, that Appellant stabbed Goodwin after the
attack on Kirkpatrick had ceased and identified Appellant, not Goodwin, as the
aggressor.   Hanson stated that he did not believe stabbing Goodwin was
reasonable, nor did he believe that Kirkpatrick was in danger of death or
serious bodily injury at the time.  These statements contradicted the portions
of Appellant’s testimony supporting his defensive theories of self–defense and
defense of a third person.  As such, resolution of the merits of Appellant’s
defenses rested, in large part, on which of these two witnesses—Appellant or
Hanson—the jury deemed more credible.  Detective Barber’s opinion testimony that
Appellant did not act in self–defense or in defense of Kirkpatrick was
essentially a statement that Appellant was not credible. 

2. 
Whether Detective Barber=s
testimony was cumulative.  Detective Barber was the only witness who expressed
an opinion about whether Appellant acted in self–defense or defense of a third
person.  However, Hanson testified that he did not think stabbing Goodwin was
reasonable and that he did not think stabbing Hanson was the only way Appellant
could have helped Kirkpatrick.

3. 
The presence or absence of evidence corroborating or contradicting Detective
Barber=s
testimony on material points.    Some of the evidence, if believed, corroborates
Detective Barber=s
testimony that Appellant did not act in self–defense or defense of a third
person. Two of the State’s witnesses testified that Appellant showed them a
knife and told them several times that if someone messed with his friend, he
would kill them.  Christopher Freeman and Akin testified that Appellant never approached
them with a knife and told them to stop beating Kirkpatrick. Hanson testified
that after the men stopped attacking Kirkpatrick, he saw Appellant chasing
Goodwin and that Appellant was holding a knife and cursing at Goodwin. Hanson also
testified that he did not think stabbing Goodwin was the only way Appellant
could have helped Kirkpatrick.  He stated further that stabbing Goodwin was not
reasonable.

Appellant’s
version of the incident conflicts with Detective Barber’s opinion testimony.  Christopher
Freeman, one of Kirkpatrick’s attackers, testified that, while Kirkpatrick was
still on the ground, Appellant picked up his knife, held it to Goodwin’s
throat, and threatened to kill him if he moved.  Three witnesses testified that
Appellant was in a good mood at Rick’s and that they did not see him display a
knife or hear him threaten to kill anyone who messed with his friend. 








4. 
The extent of cross examination otherwise permitted. Appellant was
otherwise permitted to cross examine Detective Barber fully. 

5. 
The overall strength of the State’s case. The State’s case against
Appellant was not strong because there was no witness to the incident who could
provide an uncontroverted account of what occurred.  Moreover, all but one of
the witnesses admitted to having consumed alcohol and some admitted to being intoxicated;
some had engaged in conduct during the incident that may have been criminal;
some may have been biased; and some may otherwise have been unreliable. 
Consequently, a significant factor in the State’s case was witness
credibility.  

Appellant
admitted that he stabbed Goodwin, but maintained that he acted in self–defense
and in defense of a third person.  On certain points, some of the trial
testimony was consistent with that of Appellant.  For example, Christopher
Freeman testified, as did Appellant, that the attack on Kirkpatrick was still
in progress when Appellant stabbed Goodwin.  But Freeman admitted that he was
intoxicated at the time.  Hanson’s testimony in particular was contrary to those
portions of Appellant’s testimony that were critical to his defensive
theories.  Consequently, a favorable determination of Hanson’s credibility was
central to the State’s case.  But Hanson testified that he had “[m]aybe three
or four beers at the most.”   The opinion testimony of Detective Barber, who
had investigated the case and already assessed Appellant’s credibility, implicitly
credited Hanson’s testimony and therefore weighed in favor of the State.

5. 
Assessment of Harm

Based
upon our initial assumption and the above application of the Van Arsdall
factors, we now apply the appropriate standard to determine harm. See Tex. R. App. P. 44.2(a); Shelby,
819 S.W.2d at 547; Smith, 236 S.W.3d at 294.  

After
reviewing the entire record, we believe this case is best characterized as being
based on incomplete and inconsistent accounts of the incident in question
provided by witnesses whose credibility may have been subject to legitimate
challenge.  Although various witnesses could be said to have provided testimony
that favored either the State or Appellant, the critical determination is
whether Appellant or Hanson was the more credible.  

As
a whole, Hanson’s testimony was more favorable to the State, while Appellant’s
supported his defensive theories of self–defense and defense of a third
person.   Hanson was not involved in the altercation except to push Goodwin off
Appellant and denied that he was intoxicated. But he admitted that he may have
had as many as three or four beers.  On the other hand, Appellant’s testimony
could be viewed as self–serving,  Moreover, he also admitted to having consumed
alcohol, but denied being intoxicated.  Against this backdrop, Detective
Barber, who could be considered a neutral witness, testified in detail about
the investigation he had conducted and related his conclusion about whether Appellant
acted in self-defense or defense of a third party.  Because of his neutrality
and the extent of his investigation, when considered in light of the
credibility issues presented, the jury could have given undue weight to his
testimony.

            Detective
Barber was unequivocal in his testimony about whether Appellant acted in
defense of a third person and implicitly testified that Appellant did not act
in self-defense.  However, his excluded statement contradicts his testimony. 
Had the statement been admitted, it may have cast doubt on his credibility and
weakened the significance of his overall testimony.  At the very least, it would
have required explanation.  Without the statement, Appellant had no means by
which to defend against the impact of Detective Barber’s statement and was therefore
left with an incomplete defense.

In
addressing the preceding issue, we considered whether the admission of
Detective Barber’s testimony was harmful.  After applying the pertinent factors
and standard of review that govern such an analysis, we expressed our concern
that the jury may have given undue weight to the testimony, but held that admission
of the testimony was harmless.  Based upon our review of the error and the
record and our application of the Van Arsdall  factors and the
applicable standard of review, we cannot conclude beyond a reasonable doubt
that prohibiting Appellant from cross examining the detective about his prior
inconsistent statement did not contribute to the conviction.  See Shelby , 819 S.W.2d at 551.  Therefore, we hold that the trial court’s error
was harmful.  Accordingly, Appellant=s
third issue is sustained. 

 

Disposition








We
have overruled Appellant’s second issue and sustained Appellant’s third issue. 
Having sustained Appellant=s
third issue, we reverse the trial court=s judgment and remand the case
to the trial court for a new trial.  Because Appellant’s remaining issues are
not necessary to the final disposition of this appeal, we do not address them. 
See Tex. R. App. P. 47.1.

 

                                                                                      
 SAM GRIFFITH   

                                                                                                  
Justice

 

 

Opinion delivered December 2,
2009.

Panel
consisted of Worthen, C.J., Griffith, J., and Hoyle, J.

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

(DO NOT PUBLISH)









[1] See Tex. Penal Code Ann. ' 22.02(a), (b) (Vernon Supp. 2009).





[2]
“Fentanyl” is a narcotic analgesic used in combination with other drugs before,
during, or following surgery.  The
American Heritage® Stedman’s Medical Dictionary 299 (Houghton
Mifflin Co. 1995).

 





[3] An individual adjudged guilty of a second degree
felony shall be punished by imprisonment for any term of not more than twenty
years or less than two years and, in addition, a fine not to exceed $10,000. Tex. Penal Code Ann. § 12.33
(Vernon 2003).





[4]
Although the State’s complains that Detective Barber’s prior inconsistent
statement is hearsay, we note that his excluded testimony was offered for
impeachment purposes only, and not as substantive evidence of the truth of the
matters stated. See Staley, 888 S.W.2d at 49; Pope,
774 S.W.2d at 745. Therefore, Detective Barber’s excluded testimony is not
hearsay. See Goode, et al., supra, § 613.2.