# NO. 12-07-00428-CR

# IN THE COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT

# TYLER, TEXAS

| | | |
|---|---|---|
| *REX LEE WILLIAMS,*<br>*APPELLANT* | § | *APPEAL FROM THE 241ST* |
| *V.* | § | *JUDICIAL DISTRICT COURT* |
| *THE STATE OF TEXAS,*<br>*APPELLEE* | § | *SMITH COUNTY, TEXAS* |

## *MEMORANDUM OPINION*

Rex Lee Williams appeals his conviction for aggravated assault with a deadly weapon. On appeal, Appellant raises four issues. We reverse and remand.

## BACKGROUND

Appellant was charged by indictment with aggravated assault, a second degree felony.[1] More specifically, the indictment alleged that Appellant (1) "intentionally, knowingly, or recklessly cause[d] serious bodily injury to Scott Goodwin by striking with hand and striking with knife and striking with sharp object;" (2) "intentionally, knowingly or recklessly cause[d] serious bodily injury to Scott Goodwin by striking with hand and striking with knife and striking with sharp object, and . . . did then and there use or exhibit a deadly weapon, to-wit: hand and knife and sharp object, during the commission of the assault;" and (3) "used or exhibited a deadly weapon, to-wit: hand and knife and sharp object in the manner of its use and intended use was capable of causing death and serious bodily injury, during the commission of or immediate flight from said offense." Appellant

---

[1] *See* TEX. PENAL CODE ANN. § 22.02(a), (b) (Vernon Supp. 2009).

pleaded "not guilty," and the matter proceeded to a jury trial.

At trial, L. C. Kirkpatrick stated that, on the evening of the incident, he and Appellant went to Rick's On The Square in Tyler, Texas. According to Kirkpatrick, he and Appellant consumed alcohol. Around midnight, they left Rick's and, as they were walking to a car, "a couple of guys" in a group of other people began yelling in their direction. Kirkpatrick did not know the men or what they were yelling, but stated that the men were yelling in a negative, aggressive tone. Appellant walked across the street to determine why the men were yelling at them. Kirkpatrick stated that after Appellant confronted the men, a fistfight began. Kirkpatrick ran toward Appellant in an attempt to break up the fight. As he did so, a man tackled him and, within seconds, Kirkpatrick's assailant was joined by at least two other men. Kirkpatrick testified that he was on the ground trying to protect his face while being hit, kicked, and stomped, but believed he could not protect himself. Suddenly, the attack stopped. Although he testified that he sustained a severe injury, he also stated that he did not go to the emergency room, an emergency clinic, or a doctor for his injuries.

Appellant testified that as he walked across the street toward the men yelling at him, he and the men exchanged words. At least two of the men walked toward him. Someone to Appellant's left, whom he later assumed was Goodwin, hit him in the face. Appellant stated that he attempted to defend himself, but fell onto his back on the ground after being "bulldozed" by Goodwin and another man. While both men were hitting him, Appellant saw "out of [his] peripheral vision" that Kirkpatrick was being kicked and beaten by three or four men. According to Appellant, he immediately became concerned about what was going to happen to Kirkpatrick and pleaded with Goodwin to get off him. Goodwin did not comply. Appellant then pulled his knife from his pocket, opened it, and showed it to Goodwin. Appellant stated that he and Goodwin began fighting and wrestling for the knife when a friend of Appellant's pushed Goodwin off him. Appellant picked up the knife, ran over to Kirkpatrick with the knife open, and tried to scare the men beating Kirkpatrick by yelling at them to get off Kirkpatrick or he would kill them. Then, Appellant noticed Goodwin running toward him "at a full sprint." He testified that he believed he only stabbed Goodwin once. But he also testified that "things were going so fast" that he could have stabbed him again. According to Appellant, he was in fear of death or serious bodily injury for both himself and Kirkpatrick.

Scott Goodwin testified that on the night of the incident, he was at Rick's for a bachelor

2

party. He remembered that one of his friends offered to buy a round of drinks, but could not recall anything else that occurred that night. He stated that his next memory was of being in the hospital, but also stated that he was on so much medication that he could not really determine his next memory. According to Goodwin, he was in the intensive care unit for forty-two days on a fentanyl[2] drip and morphine followed by an immobilizer drug for the next two weeks. He was also in rehabilitation. Goodwin stated that every muscle in his left leg was severed to the bone, and that he was stabbed in the back, chest, and stomach.

After the trial concluded, the jury found Appellant guilty of aggravated assault with a deadly weapon as charged in the indictment, and assessed his punishment at eight years of imprisonment.[3] This appeal followed.

## OPINION TESTIMONY

In his second issue, Appellant contends that the trial court erred in permitting the investigating detective to state his opinion about whether Appellant was acting in defense of a third person or in self-defense when he stabbed Goodwin. He argues that the detective's opinion involved the ultimate issue in the case. The State contends that Appellant's "ultimate issue" objection is no longer a valid objection and that his hearsay objection was not a proper objection to an expert's opinion testimony. Appellant does not challenge the State's characterization of the detective as an expert.

### Standard of Review

A trial court's decision to admit or exclude evidence is reviewed under an abuse of discretion standard. *See Rodriguez v. State*, 203 S.W.3d 837, 841 (Tex. Crim. App.2006); *Montgomery v. State*, 810 S.W.2d 372, 390-91 (Tex. Crim. App.1990). The trial court is in the best position to decide questions of admissibility, and we will uphold a trial court's decision to admit or exclude evidence if it is "within the zone of reasonable disagreement." *Rodriguez*, 203 S.W.3d at 841. We

---

2 "Fentanyl" is a narcotic analgesic used in combination with other drugs before, during, or following surgery. THE AMERICAN HERITAGE® STEDMAN'S MEDICAL DICTIONARY 299 (Houghton Mifflin Co. 1995).

[3] An individual adjudged guilty of a second degree felony shall be punished by imprisonment for any term of not more than twenty years or less than two years and, in addition, a fine not to exceed $10,000. TEX. PENAL CODE ANN. § 12.33 (Vernon 2003).

cannot reverse a trial court's admissibility decision solely because we disagree with it. *Id*. If the trial court's ruling on the admission of evidence is correct under any theory of law, the trial court's decision should not be disturbed, even if the trial court gives the wrong reason for its ruling. *See Romero v. State*, 800 S.W.2d 539, 543 (Tex. Crim. App.1990).

## Applicable Law

Testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact. TEX. R. EVID. 704. Consequently, an objection that an expert's testimony invades the province of the jury is no longer valid. *Ortiz v. State*, 834 S.W.2d 343, 348 (Tex. Crim. App. 1992). Testimony that merely *embraces* an ultimate issue is clearly admissible under rule 704. *Duckett v. State*, 797 S.W.2d 906, 920 (Tex. Crim. App. 1990), *overruled on other grounds*, *Cohn v. State*, 849 S.W.2d 817, 819 (Tex. Crim. App. 1993). Further, a lay witness may offer an opinion on an ultimate issue. *Ex parte Nailor*, 149 S.W.3d 125, 135 (Tex. Crim. App. 2004). However, an expert may not state a legal conclusion, *Hernandez v. State*, 772 S.W.2d 274, 275 (Tex. App.–Corpus Christi 1989, no pet.), or give an opinion as to the truth or falsity of other testimony. *Taylor v. State*, 774 S.W.2d 31, 34 (Tex. App.–Houston [14th Dist.] 1989, pet. ref'd). If a trial court permits an expert to give his opinion about whether he believed a complainant was telling the truth or could be believed, that testimony not only embraces the ultimate issue, but crosses the line from *assisting* the trier of fact to *replacing* that body as decision maker. *Duckett*, 797 S.W.2d at 920.

## Analysis

Detective Chuck Barber, an eighteen year veteran detective with the Tyler Police Department, testified that he was the investigator for the incident in question. His role was to ensure that statements were obtained from witnesses and that evidence was collected and documented. On cross examination, Detective Barber testified that he believed Kirkpatrick was "fortunate to not get more injured since he had three or four or five individuals beating on him." On redirect examination, he stated that Kirkpatrick did not suffer serious bodily injury. Then, the State asked Detective Barber if he was "telling the ladies and gentlemen of the jury that you believe that the defendant acted out of self–defense of [Kirkpatrick] or himself?" Appellant objected that the State's question was a jury question and not for the detective to determine, but the trial court overruled his objection. Detective

4

Barber then testified that he did not believe Appellant acted out of defense of Kirkpatrick.

*Defense of a Third Person*

A witness may not testify whether he thinks a complainant can be believed because such testimony replaces the trier of fact as decision maker. *See id*. Moreover, defense of a third person is an issue of fact to be determined by the jury. *See Saxton v. State*, 804 S.W.2d 910, 913-14 (Tex. Crim. App. 1991). Here, Appellant testified, in part, that he was acting in defense of a third person, Kirkpatrick, when he stabbed Goodwin. However, Detective Barber testified that he did not believe Appellant acted in defense of Kirkpatrick. This is, in effect, a statement that Appellant's testimony could not be believed. Thus, Detective Barber's answer crossed the line from assisting the jury to replacing the jury as decision maker. *See Duckett*, 797 S.W.2d at 920. Therefore, the trial court's decision to admit Detective Barber's opinion testimony regarding whether Appellant acted in defense of a third person was outside the zone of reasonable disagreement. *See Rodriguez*, 203 S.W.3d at 841.

*Harm Analysis*

But a determination that error occurred is only one part of the analysis. The erroneous admission of Detective Barber's opinion testimony was nonconstitutional error. *See Solomon v. State*, 49 S.W.3d 356, 365 (Tex. Crim. App. 2001). Nonconstitutional error that does not affect the substantial rights of the defendant must be disregarded. TEX. R. APP. P. 44.2(b). Substantial rights are not affected by the erroneous admission of evidence if the appellate court, after examining the record as a whole, has fair assurance that the error did not influence the jury, or had but a slight effect. *Motilla v. State*, 78 S.W.3d 352, 355 (Tex. Crim. App. 2002). In conducting a harm analysis, an appellate court should consider everything in the record, including any testimony or physical evidence admitted for the jury's consideration, the trial court's instructions to the jury, the state's theory, any defensive theories, closing arguments, and even voir dire, if material. *Motilla*, 78 S.W.3d at 355-56; *Morales v. State*, 32 S.W.3d 862, 867 (Tex. Crim. App. 2000). Other factors to be considered are the nature of the evidence supporting the verdict, the character of the alleged error, and how the evidence might be considered in connection with the other evidence in the case. *Motilla*, 78 S.W.3d at 355; *Morales*, 32 S.W.3d at 867. Whether the state emphasized the error can also be a factor. *Motilla*, 78 S.W.3d at 356.

5

The record shows that whether Appellant acted in defense of a third person or in self–defense was the pivotal issue in the case. The record shows further that all but one of the witnesses (Jeffrey Freeman) had been drinking alcohol, and some admitted to being intoxicated. Some of the witnesses were involved in at least one of the fights that occurred. Consequently, the witnesses' accounts of the incident were, for the most part, incomplete and somewhat inconsistent. As such, the jury's evaluation of witness credibility was especially critical.

Appellant testified at trial, and much of his testimony is uncontroverted. Appellant described two fights that occurred simultaneously on the night of the incident: one involving Appellant, Goodwin, and another man, and one involving Kirkpatrick and three or four other men. Appellant stated that, while Goodwin was on top of him, he saw that Kirkpatrick was being kicked and beaten by three or four men. He testified that two and maybe three times he told Goodwin to "[g]et off me. My buddy is getting stomped over there." When Goodwin would not get off him, Appellant pulled his knife out of his pocket, opened it, and showed it to Goodwin. They fought over the knife until Dustin Hanson, a friend of Appellant's, pushed Goodwin off Appellant. Appellant then ran over to Kirkpatrick and, in an effort to scare the men who were beating Kirkpatrick, he displayed his knife and yelled at the men that he would kill them if they did not get off Kirkpatrick. He then noticed Goodwin running toward him "at a full sprint." Appellant admitted that he stabbed Goodwin once, but conceded that he could have stabbed him again.

Appellant related that his primary concern was what would happen to Kirkpatrick if he had to fight Goodwin instead of going to Kirkpatrick's aid. Appellant stated further that he also considered what might happen to him and that he thought both he and Kirkpatrick were in danger of death or serious bodily injury.

Two of Kirkpatrick's attackers, Christopher Freeman and Steve Dale Akin, admitted that they "jumped" Kirkpatrick, threw him to the ground, and hit and kicked him. Freeman testified that Appellant picked up his knife, held it to Goodwin's throat, and threatened to kill him if he moved. He also confirmed that while Appellant was threatening Goodwin, Kirkpatrick was still on the ground. This is consistent with Appellant's statement that the attack on Kirkpatrick did not end until after he stabbed Goodwin. However, Freeman and Akin both testified that Appellant never approached them with a knife or told them to stop beating Kirkpatrick.

6

Dustin Hanson, who had pushed Goodwin off Appellant, related his observations. Hanson testified that when he started to leave the downtown area, he heard arguing going on behind him. As he backed up his car, he noticed that Kirkpatrick was surrounded by "about five or six guys." He then got out of his car and noticed for the first time that Appellant and Goodwin were "going at it." As Hanson went toward Kirkpatrick, he stopped just long enough to push Goodwin off Appellant. He testified that he never saw any other person fighting Appellant and did not hear Appellant asking Goodwin to get off him. He admitted, however, that he did not see the beginning of the fight and that his attention was on other people after he pushed Goodwin off Appellant. Hanson stated further that he did not get to Kirkpatrick until the fight, which he characterized as lasting only "seconds," had "basically stopped." He then saw Goodwin run by him followed by Appellant, who was holding a knife and "cussing back and forth." Hanson interpreted these acts as threatening toward Goodwin. Hanson recounted that he never saw Appellant approach Kirkpatrick or Kirkpatrick's attackers. When asked whether he thought it was reasonable to stab anybody, Hanson replied, "Not at all." He also expressed his opinion that stabbing Goodwin did not appear to him to be the only way Appellant could have helped Kirkpatrick. He stated further that he did not believe Kirkpatrick was in danger of death or serious bodily injury.

Three people testified that Appellant was in a good mood at Rick's and they did not hear or see him making threats. Two other people testified that while they were at Rick's before the incident, Appellant told them several times that if someone messed with his friend, he would kill that person. Appellant showed them a knife, and one of the witnesses stated that Appellant said he would stab them. Jeffrey Freeman testified that after the stabbing, he saw Appellant growling in Goodwin's face as Goodwin was sitting, wheezing. Freeman also testified that when another person attempted to prevent Appellant from leaving after the incident, Appellant threatened to kill him too.

Based upon our review of the record, including the above testimony, we note that neither Appellant nor any other witness testified that Goodwin participated in the attack against Kirkpatrick or that Goodwin committed any act which indicated that Kirkpatrick needed protection from Goodwin. To the contrary, the testimony of Appellant, whose account of the incident was the most complete, suggests that Goodwin's attack and subsequent threatening actions were focused solely on Appellant. However, Appellant testified that he was afraid Kirkpatrick could be either killed or

7

seriously injured by the men who were "stomping" him. He further stated that he knew that "if I'm fighting with [Goodwin], then I'm not saving my friend." Consequently, he stabbed Goodwin to avoid becoming engaged in a second fight with him.

Detective Barber's testimony that he did not believe Appellant acted in defense of a third person undercuts this defensive theory, but has some support in the record. The State presented evidence of Appellant's threatening comments before the incident and his aggressive behavior afterward. However, the testimony most damaging to Appellant's position was that of Dustin Hanson. Hanson contradicted Appellant's account of the incident as to the sequence of events leading up to Goodwin's stabbing, the characterization of Goodwin as the aggressor immediately prior to the stabbing, and the imminence of death or serious bodily injury to Kirkpatrick. Moreover, Hanson's testimony supports Detective Barber's opinion.

More problematic, however, under the facts presented here is that by stating that he did not believe Appellant acted in defense of a third person (Kirkpatrick), Detective Barber communicated that he did not consider Appellant believable. In light of the multiple credibility issues in this case, the jury could have given undue weight to Detective Barber's assessment of Appellant's credibility because he was a neutral witness and had reached his conclusion based on the investigation he conducted. We note further, however, that the State elicited the challenged testimony on redirect examination and did not ask Detective Barber to elaborate further. Nor did the State emphasize Detective Barber's testimony in closing argument. Instead, the prosecutor merely referred to Appellant's asserted defense of Kirkpatrick as a "cockamamy story" and something that Appellant "cook[ed] up." If believed, Hanson's testimony supports this characterization.

The admission of Detective Barber's opinion testimony is troubling. But after considering the testimony in light of the whole record, and based upon the foregoing analysis and the applicable standard of review, we have more than a fair assurance that the error in admitting the testimony did not influence the jury or had but a slight effect on its verdict. *See **Motilla***, 78 S.W.3d at 355. Therefore, even though the trial court erred, we cannot conclude that Appellant has established the level of harm necessary to require reversal.

*Self-Defense*

Appellant also complains that Detective Barber was erroneously permitted to express an

8

opinion about whether Appellant acted out of self–defense when he stabbed Goodwin. On direct examination, the following exchange occurred between the prosecutor and Detective Barber:

> [PROSECUTOR]: Are you telling the ladies and gentlemen of the jury that you believe that the defendant acted out of self–defense of L.C. Kirkpatrick or himself?
>
> [APPELLANT'S COUNSEL]: Objection. I'm going to object. That's going to be a jury question. That's not for Detective Barber to determine.
>
> THE COURT:                 Overruled.
>
> [WITNESS]:                 Do I believe that the defendant acted out of self–defense for L.C.?
>
> [PROSECUTOR]:                 Yes.
>
> [WITNESS]:                 No, sir, I don't.
>
> [PROSECUTOR]:                 What about for himself?
>
> [WITNESS]:                 For himself?
>
> [PROSECUTOR]:                 Yes, sir. I mean, let me back up and phrase it this way. . . .

Then, the State asked Detective Barber who walked over to Goodwin and his friends. Appellant objected to the question, stating that any answer would be hearsay because Detective Barber was not present at the incident and his testimony would be taken from other persons' statements. The State rephrased the question, and Appellant did not object to the rephrased question. The State then asked Detective Barber a series of questions, which ended with the detective's admission that even after Appellant came to the police station, gave an interview, and provided DNA swabs, Appellant was still arrested. The State does not disagree with Appellant that by this testimony, Detective Barber communicated that he did not believe Appellant acted in self–defense when he stabbed Goodwin.

As a prerequisite to presenting a complaint for appellate review, the record must show that the complaint was made to the trial court by a timely request, objection, or motion that stated the grounds for the ruling that the complaining party sought from the trial court. TEX. R. APP. P. 33.1(a)(1). Further, the record must show that the trial court ruled on the request, objection, or motion, either expressly or implicitly, or refused to rule on the request, objection, or motion, and the complaining party objected to the refusal. TEX. R. APP. P. 33.1(a)(2). Here, after Appellant objected

9

to the question as eliciting hearsay, the State offered to rephrase the question, which the trial court allowed. Appellant did not object to the rephrased question or any other question in the series. Therefore, Appellant has waived this complaint. *See* Tex. R. Civ. P. 33.1.

*Conclusion*

The trial court's error in allowing Detective Barber to testify that he did not believe Appellant acted in defense of a third person was harmless. Moreover, Appellant waived his complaint regarding the State's question regarding the admission of Detective Barber's opinion on whether Appellant acted in self–defense. Accordingly, Appellant's second issue is overruled.

<br>

## PRIOR INCONSISTENT STATEMENT

In his third issue, Appellant argues that the trial court erred in prohibiting the cross examination of Detective Barber to show that he had made a prior inconsistent statement. The State contends that the statement complained of is hearsay and does not fall within any exception to the hearsay rule.

## Applicable Law

The Sixth Amendment provides in pertinent part that "the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. The right to confront opposing witnesses necessarily includes the right to cross examine. *Davis v. Alaska*, 415 U.S. 308, 315-16, 94 S. Ct. 1105, 1110, 39 L. Ed. 2d 347 (1974). Cross examination serves three general purposes: (1) it may serve to identify the witness with his community so that independent testimony may be sought and offered concerning the reputation of the witness for veracity within that community; (2) it allows the jury to assess the credibility of the witness; and (3) it allows facts to be brought out that tend to discredit the witness by showing that his testimony in chief was untrue or biased. *See Alford v. United States*, 282 U.S. 687, 691-92, 51 S. Ct. 218, 219, 75 L. Ed. 624 (1931). The right to cross examine witnesses includes the right to attack their general credibility or to show their possible bias, self–interest, or motives in testifying. *Hammer v. State*, No. PD–0786–08, 2009 WL 928561, at *4 (Tex. Crim. App. Apr. 8, 2009). "The possible animus, motive, or ill will of a prosecution witness who testifies against the defendant is never a collateral or irrelevant inquiry, and the defendant is entitled, subject to reasonable restrictions, to show any relevant fact that might tend

10

to establish ill feeling, bias, motive, interest, or animus on the part of any witness testifying against him." ***Billodeau v. State***, 277 S.W.3d 34, 42-43 (Tex. Crim. App. 2009). The right of confrontation is violated when appropriate cross examination is limited. ***Carroll v. State***, 916 S.W.2d 494, 497 (Tex. Crim. App.1996) (plurality opinion) (citing ***Hurd v. State***, 725 S.W.2d 249, 252 (Tex. Crim. App.1987)).

A witness's prior inconsistent statement is admissible for purposes of impeachment, and not as substantive evidence of the truth of the matters stated. ***Staley v. State***, 888 S.W.2d 45, 49 (Tex. App.–Tyler 1994, no pet.) (citing ***Aranda v. State***, 736 S.W.2d 702, 707 (Tex. Crim. App. 1987)); *see also **Lawhon v. State***, 284 S.W.2d 730, 730 (Tex. Crim. App. 1955); ***Pope v. Stephenson***, 774 S.W.2d 743, 745 (Tex. App.—El Paso 1989), *writ denied*, 787 S.W.2d 953 (Tex. 1990). In other words, the prior statement may not be used to prove any substantive fact at issue in the trial, but must be used solely to demonstrate self–contradiction by the witness. Peter T. Hoffman, TEXAS RULES OF EVIDENCE HANDBOOK 656-57 (8th ed. 2008-09). Therefore, these prior statements are not hearsay. *See* 1 Steven Goode, et al, GUIDE TO THE TEXAS RULES OF EVIDENCE § 613.2 (3d ed. 2002); *see also* TEX. R. EVID. 801(d) ("'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."). The rule of admissibility of prior inconsistent statements should be liberally construed, and the trial court has the discretion to receive any evidence that gives promise of exposing a falsehood. ***Staley***, 888 S.W.2d at 49.

## Analysis

As noted above, Detective Barber previously testified that he did not believe Appellant acted in self–defense or in defense of a third person. Based on the State's question, Appellant proposed asking Detective Barber if "in [his] interview with [Appellant], did he consistently maintain his–that he was acting out of self–defense and defense of a third person?" Appellant also proposed asking Detective Barber if "during his interview with [Kirkpatrick] did he make the statement to Kirkpatrick that 'enough of your story matches what I already know. [Appellant] has already told the truth, and that's all that matters.'" In response, the State argued that anything Appellant would have told Detective Barber would be "rank" hearsay, and that Appellant had not pointed to any applicable hearsay exception. The trial court sustained the State's objections.

11

Regarding the first question, the trial court found that Appellant would be proffering statements of Appellant through Detective Barber and, thus, his testimony would be hearsay. As to the second question, the trial court found that Detective Barber would be stating his opinion about whether Appellant told the truth. In a bill of exception, Detective Barber testified that during the course of a recorded interview, Appellant maintained that he acted in self–defense and in defense of a third person. He also testified that in a recorded interview with Kirkpatrick, he said, "Okay. Enough of your story matches what I already know. [Appellant] has already told the truth, and that's what matters."

*Limitation of Cross Examination*

Appellant's proposed questions were for the purpose of impeaching Detective Barber's previous testimony. *See Staley*, 888 S.W.2d at 49. In answer to Appellant's questions in the bill of exception, Detective Barber admitted that he told Kirkpatrick in a recorded interview that he believed Appellant told the truth in his interview. But the detective testified at trial that he did not believe Appellant acted in defense of a third person and implicitly expressed his opinion that he did not believe Appellant acted in self–defense. Thus, his testimony directly contradicted his prior statement to Kirkpatrick.

Jurors are entitled to have the benefit of the defense before them so that they can make an informed decision regarding the weight to be given the witness's testimony. *Maxwell v. State*, 48 S.W.3d 196, 199 (Tex. Crim. App. 2001). Appellant's cross examination about his statement to Kirkpatrick would have allowed the jury to more completely assess Detective Barber's credibility, and to draw inferences relating to the reliability of his testimony. *See Alford*, 282 U.S. at 691-92, 51 S. Ct. at 219. Because Detective Barber's trial testimony contradicted his prior statement to Kirkpatrick, and Appellant's proposed questions properly served the purposes of cross examination, the trial court erred in limiting Appellant's cross examination of Detective Barber.[4] *See id.*; *Staley*, 888 S.W.2d at 49.

---

[4] Although the State's complains that Detective Barber's prior inconsistent statement is hearsay, we note that his excluded testimony was offered for impeachment purposes only, and not as substantive evidence of the truth of the matters stated. *See Staley*, 888 S.W.2d at 49; *Pope*, 774 S.W.2d at 745. Therefore, Detective Barber's excluded testimony is not hearsay. *See* Goode, et al., *supra,* § 613.2.

*Harm Analysis*

Improper limitation of cross examination violates the confrontation clauses of both the federal and state constitutions and is subject to a constitutional harm analysis. U. S. CONST. amend. VI; TEX. CONST. art. I, § 10; TEX. R. APP. P. 44.2(a); *Love v. State*, 861 S.W.2d 899, 904 (Tex. Crim. App. 1993). Although Appellant argues that the trial court's error in limiting the cross examination of Detective Barber violated the Texas Constitution, he does not provide any separate argument or authority explaining how the protections offered by the Texas Constitution differ from the protections guaranteed by the United States Constitution. Likewise, Appellant does not argue that the Texas Constitution sets out a different or higher standard than the federal constitution. Consequently, the state claims raised by Appellant are waived, and we review only his federal claims. *See Moore v. State*, 935 S.W.2d 124, 128 (Tex. Crim. App. 1996); *Lawton v. State*, 913 S.W.2d 542, 558 (Tex. Crim. App. 1995), *overruled on other grounds*, *Moseley v. State*, 983 S.W.2d 249, 263 (Tex. Crim. App. 1998). Because a violation of the right to cross examination under the Confrontation Clause necessarily means that the testimony was not permitted before the fact finder, we apply a three pronged test in our review of the exclusion of such evidence. *Shelby v. State*, 819 S.W.2d 544, 547 (Tex. Crim. App. 1991) (citing *Delaware v. Van Arsdall*, 475 U.S. 673, 684, 106 S. Ct. 1431, 1438, 89 L.Ed.2d 674 (1986)); *Smith v. State*, 236 S.W.3d 282, 294 (Tex. App.-Houston [1st Dist.] 2007, no pet.).

In conducting the required harm analysis, we first assume that the damaging potential of the cross examination was fully realized. *Shelby*, 819 S.W.2d at 547 (citing *Van Arsdall*, 475 U.S. at 684, 106 S. Ct. at 1438); *Smith*, 236 S.W.3d at 294. Second, with that assumption in mind, we analyze the error in connection with the following factors: (1) the importance of the witness's testimony to the state's case; (2) whether the testimony was cumulative; (3) the presence or absence of evidence corroborating or contradicting the witness's testimony on material points; (4) the extent of cross examination otherwise permitted; and (5) the overall strength of the prosecution's case. *See Shelby*, 819 S.W.2d at 547 (citing *Van Arsdall*, 475 U.S. at 684, 106 S. Ct. at 1438); *Smith*, 236 S.W.3d at 294. Finally, in light of the first two prongs, we determine the effect of the error. *See* TEX. R. APP. P. 44.2(a); *Shelby*, 819 S.W.2d at 547; *Smith*, 236 S.W.3d at 294. As we stated in our discussion of Appellant's first issue, nonconstitutional error is harmless unless it affects the

13

substantial rights of the defendant. *See* TEX. R. APP. P. 44.2(b). And substantial rights are not affected if, after examining the record as a whole, we have fair assurance that the error did not influence the jury, or had but a slight effect. *See Motilla,* 78 S.W.3d at 355. When we review constitutional error, however, the standard is more stringent. In conducting such a review, we must reverse a judgment of conviction or punishment unless we determine beyond a reasonable doubt that the error did not contribute to the conviction or punishment. TEX. R. APP. P. 44.2(a).

As we begin our analysis, we first assume that the jury was fully informed that (1) in his interview with Detective Barber, Appellant consistently maintained that he had acted in self–defense and in defense of a third person, and that (2) Detective Barber told Kirkpatrick that his story matched what the detective "already [knew]," and that "Appellant [had] already told the truth[.]" *See Shelby*, 819 S.W.2d at 547 (citing *Van Arsdall*, 475 U.S. at 684, 106 S. Ct. at 1438); *Smith*, 236 S.W.3d at 294. In other words, we are required to assume in our analysis that Detective Barber's statement to Kirkpatrick was before the jury. With this assumption in mind, we apply the five *Van Arsdall* factors to the record before us. *See Shelby*, 819 S.W.2d at 547 (citing *Van Arsdall*, 475 U.S. at 684, 106 S. Ct. at 1438); *Smith*, 236 S.W.3d at 294.

1. *The importance of Detective Barber's testimony to the State's case.* Detective Barber's testimony was important to the State's case because he was the investigating detective. His role was to insure that statements were taken from any witnesses as soon as possible after the incident and that the evidence was documented and collected. In this role, he could be considered a neutral witness.

At trial, Detective Barber described his investigation. He mentioned the names of several people who were with Appellant at the time of the incident and told the detective that Appellant had stabbed Goodwin. He also informed the jury that, in his experience, if a person has committed "some form of offense or a crime, they don't typically come and seek the police out to tell us about it. They flee and try to stay concealed." He then identified persons he had to "seek out," including Kirkpatrick and Appellant. He testified that he was unable to "get ahold" of Kirkpatrick and obtain a statement from him until approximately a month after the incident. Detective Barber also testified that he conducted a "fairly extensive" interview of Appellant during which Appellant admitted he stabbed Scott Goodwin. The State asked Detective Barber whether he believed that Appellant acted in defense of Kirkpatrick, and Detective Barber said that he did not. In response to a series of

14

questions, Detective Barber also stated that he interviewed Appellant and that Appellant was arrested thereafter. The questions were asked after Appellant objected to Detective Barber's being questioned by the State regarding whether he believed Appellant stabbed Goodwin in self–defense. In this context, the implication of his reference to Appellant's ultimate arrest after the interview is that Detective Barber did not believe Appellant acted in self–defense.

Appellant testified and gave his version of the incident. Although the testimony of several witnesses cast doubt on some of the details Appellant recounted, the most damaging testimony came from Dustin Hanson. Hanson was Appellant's friend, and had pulled Goodwin off Appellant during the fight Appellant described in his testimony. Hanson testified, in part, that Appellant stabbed Goodwin after the attack on Kirkpatrick had ceased and identified Appellant, not Goodwin, as the aggressor. Hanson stated that he did not believe stabbing Goodwin was reasonable, nor did he believe that Kirkpatrick was in danger of death or serious bodily injury at the time. These statements contradicted the portions of Appellant's testimony supporting his defensive theories of self–defense and defense of a third person. As such, resolution of the merits of Appellant's defenses rested, in large part, on which of these two witnesses—Appellant or Hanson—the jury deemed more credible. Detective Barber's opinion testimony that Appellant did not act in self–defense or in defense of Kirkpatrick was essentially a statement that Appellant was not credible.

*2. Whether Detective Barber's testimony was cumulative.* Detective Barber was the only witness who expressed an opinion about whether Appellant acted in self–defense or defense of a third person. However, Hanson testified that he did not think stabbing Goodwin was reasonable and that he did not think stabbing Hanson was the only way Appellant could have helped Kirkpatrick.

*3. The presence or absence of evidence corroborating or contradicting Detective Barber's testimony on material points.* Some of the evidence, if believed, corroborates Detective Barber's testimony that Appellant did not act in self–defense or defense of a third person. Two of the State's witnesses testified that Appellant showed them a knife and told them several times that if someone messed with his friend, he would kill them. Christopher Freeman and Akin testified that Appellant never approached them with a knife and told them to stop beating Kirkpatrick. Hanson testified that after the men stopped attacking Kirkpatrick, he saw Appellant chasing Goodwin and that Appellant was holding a knife and cursing at Goodwin. Hanson also testified that he did not think stabbing

15

Goodwin was the only way Appellant could have helped Kirkpatrick. He stated further that stabbing Goodwin was not reasonable.

Appellant's version of the incident conflicts with Detective Barber's opinion testimony. Christopher Freeman, one of Kirkpatrick's attackers, testified that, while Kirkpatrick was still on the ground, Appellant picked up his knife, held it to Goodwin's throat, and threatened to kill him if he moved. Three witnesses testified that Appellant was in a good mood at Rick's and that they did not see him display a knife or hear him threaten to kill anyone who messed with his friend.

4. *The extent of cross examination otherwise permitted.* Appellant was otherwise permitted to cross examine Detective Barber fully.

5. *The overall strength of the State's case.* The State's case against Appellant was not strong because there was no witness to the incident who could provide an uncontroverted account of what occurred. Moreover, all but one of the witnesses admitted to having consumed alcohol and some admitted to being intoxicated; some had engaged in conduct during the incident that may have been criminal; some may have been biased; and some may otherwise have been unreliable. Consequently, a significant factor in the State's case was witness credibility.

Appellant admitted that he stabbed Goodwin, but maintained that he acted in self–defense and in defense of a third person. On certain points, some of the trial testimony was consistent with that of Appellant. For example, Christopher Freeman testified, as did Appellant, that the attack on Kirkpatrick was still in progress when Appellant stabbed Goodwin. But Freeman admitted that he was intoxicated at the time. Hanson's testimony in particular was contrary to those portions of Appellant's testimony that were critical to his defensive theories. Consequently, a favorable determination of Hanson's credibility was central to the State's case. But Hanson testified that he had "[m]aybe three or four beers at the most." The opinion testimony of Detective Barber, who had investigated the case and already assessed Appellant's credibility, implicitly credited Hanson's testimony and therefore weighed in favor of the State.

5. *Assessment of Harm*

Based upon our initial assumption and the above application of the ***Van Arsdall*** factors, we now apply the appropriate standard to determine harm. *See* TEX. R. APP. P. 44.2(a); ***Shelby***, 819 S.W.2d at 547; ***Smith***, 236 S.W.3d at 294.

16

After reviewing the entire record, we believe this case is best characterized as being based on incomplete and inconsistent accounts of the incident in question provided by witnesses whose credibility may have been subject to legitimate challenge. Although various witnesses could be said to have provided testimony that favored either the State or Appellant, the critical determination is whether Appellant or Hanson was the more credible.

As a whole, Hanson's testimony was more favorable to the State, while Appellant's supported his defensive theories of self–defense and defense of a third person. Hanson was not involved in the altercation except to push Goodwin off Appellant and denied that he was intoxicated. But he admitted that he may have had as many as three or four beers. On the other hand, Appellant's testimony could be viewed as self–serving, Moreover, he also admitted to having consumed alcohol, but denied being intoxicated. Against this backdrop, Detective Barber, who could be considered a neutral witness, testified in detail about the investigation he had conducted and related his conclusion about whether Appellant acted in self-defense or defense of a third party. Because of his neutrality and the extent of his investigation, when considered in light of the credibility issues presented, the jury could have given undue weight to his testimony.

Detective Barber was unequivocal in his testimony about whether Appellant acted in defense of a third person and implicitly testified that Appellant did not act in self-defense. However, his excluded statement contradicts his testimony. Had the statement been admitted, it may have cast doubt on his credibility and weakened the significance of his overall testimony. At the very least, it would have required explanation. Without the statement, Appellant had no means by which to defend against the impact of Detective Barber's statement and was therefore left with an incomplete defense.

In addressing the preceding issue, we considered whether the admission of Detective Barber's testimony was harmful. After applying the pertinent factors and standard of review that govern such an analysis, we expressed our concern that the jury may have given undue weight to the testimony, but held that admission of the testimony was harmless. Based upon our review of the error and the record and our application of the *Van Arsdall* factors and the applicable standard of review, we cannot conclude beyond a reasonable doubt that prohibiting Appellant from cross examining the detective about his prior inconsistent statement did not contribute to the conviction. *See Shelby*, 819

17

S.W.2d at 551. Therefore, we hold that the trial court's error was harmful. Accordingly, Appellant's third issue is sustained.

## DISPOSITION

We have overruled Appellant's second issue and sustained Appellant's third issue.  Having sustained Appellant's third issue, we *reverse* the trial court's judgment and *remand* the case to the trial court for a new trial.  Because Appellant's remaining issues are not necessary to the final disposition of this appeal, we do not address them.  *See* TEX. R. APP. P. 47.1.

  SAM GRIFFITH  
Justice

Opinion delivered December 2, 2009.
*Panel consisted of Worthen, C.J., Griffith, J., and Hoyle, J.*

(DO NOT PUBLISH)