**Perry Joe SHELBY, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 1211–90.**

Court of Criminal Appeals of Texas,
En Banc.

Nov. 13, 1991.

Robert A. Morrow (Court-appointed on appeal), Houston, for appellant; Janet Seymour Morrow, of counsel).

John B. Holmes, Jr., Dist. Atty., and Linda A. West, Asst. Dist. Atty., Houston, Robert Huttash, State's Atty., Austin, for the State.

## OPINION ON APPELLANT'S PETITION FOR DISCRETIONARY REVIEW

BAIRD, Judge.

Appellant was convicted of aggravated sexual assault. Tex.Penal Code Ann. § 22.021. The trial court assessed punishment at thirty-five years confinement.

with the Court's opinion. The writ of mandamus will issue only if she refuses to do so.

Tex.Penal Code Ann. § 12.42(c). The Court of Appeals affirmed in an unpublished opinion. *Shelby v. State,* No. B14–85–842–CR, 1987 WL 8788 (Tex.App.—Houston [14th Dist.] delivered April 2, 1987) (Not published). We granted appellant's petition for discretionary review, and, in an unpublished opinion, reversed the judgment of the Court of Appeals and remanded the case to the Court of Appeals with instructions to perform a harmless error analysis. *Shelby v. State,* No. 491–87 (Tex.Cr.App. delivered January 24, 1990) (Not published) [819 S.W.2d 478 (table)]. On remand, the Court of Appeals again affirmed the judgment of the trial court. *Shelby v. State,* 800 S.W.2d 584 (Tex.App.—Houston [14th Dist.] 1990). We granted appellant's subsequent petition for discretionary review. We will reverse.

## I. PREVIOUS OPINIONS

While the initial opinions of the Court of Appeals and this Court were not published, they are important to understand the issue presented. On direct appeal appellant raised two points of error relating to the testimony of the complainant's mother. In his first point, appellant argued the trial court improperly limited his cross-examination of the complainant's mother. Specifically, appellant sought to cross-examine the complainant's mother regarding a pending lawsuit seeking $125,000.00 in damages against the owners of the apartment complex where the alleged incident occurred.[1] The Court of Appeals held appellant's bill of exception was insufficient to establish the relationship between the lawsuit and the offense and, therefore, the record did

not demonstrate an abuse of discretion on the part of the trial court. *Shelby v. State,* No. B14–85–842–CR (Tex.App.—Houston [14th Dist.] April 2, 1987) (Not published). Slip op. at 2.

On appellant's petition for discretionary review we held that it was "apparent from the record that the appellant wanted to question [the complainant's mother] about a lawsuit she brought two months after she reported the offense to the police against the appellant and the corporate owners of the property. It defies both reason and logic to argue that the trial court did not understand the purpose or scope of the inquiry." *Shelby v. State,* No. 491–87 (Tex.Cr.App. delivered January 24, 1990) (Not published). Slip op. at 4.

Additionally, we found the trial court erred by improperly limiting the scope of appellant's cross-examination of the complainant's mother. Finally, we held that the improper limitation of cross-examination was subject to a harmless error analysis and remanded the case to the Court of Appeals for such an analysis. *Shelby v. State,* No. 491–87 (Tex.Cr.App. delivered January 24, 1990) (Not published). Slip op. at 5.

On remand, the Court of Appeals concluded the erroneous limitation of the cross-examination was harmless and affirmed the judgment of the trial court. *Shelby v. State,* 800 S.W.2d at 587.

We granted appellant's second petition for discretionary review to determine whether the harmless error analysis performed by the Court of Appeals was correct, and if the analysis was incorrect, what analysis should be employed.[2]

---

1. Specifically, appellant's two points of error on direct appeal contended:

 The trial court erroneously excluded impeachment evidence concerning the complainant's mother's motive for testifying. The court erred in admitting the "outcry" testimony from the complainant's mother, because it was not admissible under 38.072, V.A.C.C.P.; also, the State had corroborating evidence so the outcry was not admissible under 38.07, V.A.C.C.P.

2. Specifically, appellant sets forth his ground(s) for review as follows:

 Whether the court below correctly applied the harmless error standard in any respect:
 1) Whether, when the issue is one of improper exclusion of cross-examination, rather than admission of improper evidence, the reviewing court may use an "outcome determinative" test for harmless error;
 2) Whether the reviewing court can incorporate into the harmless error test an alleged "failure to request a limiting instruction" in assessing whether an erroneous restriction of cross-examination made no contribution to the conviction;

## II. THE CONFRONTATION CLAUSE AND *VAN ARSDALL*

The Confrontation Clause of the Sixth Amendment of the United States Constitution guarantees the right of an accused "to be confronted with the witnesses against him." The primary interest secured by the Confrontation Clause is the right of cross-examination. *Douglas v. Alabama*, 380 U.S. 415, 418, 85 S.Ct. 1074, 1076, 13 L.Ed.2d 934 (1965). The Sixth Amendment's right of confrontation is a fundamental right and is applicable to the States by virtue of the Fourteenth Amendment. *Pointer v. Texas*, 380 U.S. 400, 403, 85 S.Ct. 1065, 1068, 13 L.Ed.2d 923 (1965).

In *Delaware v. Van Arsdall*, 475 U.S. 673, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986) the defendant was denied the right to cross-examine witness Fleetwood on the issue of possible bias after the State had dismissed a criminal charge against Fleetwood in exchange for Fleetwood's promise to discuss the State's case against the defendant. *Id.*, 106 S.Ct. at 1434. The Supreme Court of Delaware held that a blanket prohibition against exploring potential bias through cross-examination was *per se* reversible error so that the actual impact of such error need not be subject to a harmless error analysis. *Id.*

The United States Supreme Court reviewed the decision of the Delaware Supreme Court and initially addressed the threshold question of how to determine when the Confrontation Clause has been violated. In *Van Arsdall* the State argued for an "outcome determinative" analysis that "unless the particular limitation on cross-examination created a reasonable possibility that the jury returned an inaccurate guilty verdict, that limitation would not violate the Confrontation Clause." *Van Arsdall*, 106 S.Ct. at 1435. The Court expressly rejected the State's argument and held:

> 3) Whether, using the proper test and acknowledging the actual facts shown by the record, it can be said beyond a reasonable doubt that the restriction of cross-examination made no contribution to the conviction.

... While some constitutional claims by their nature require a showing of prejudice with respect to the trial as a whole, see, e.g., *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) (ineffective assistance of counsel), the focus of the Confrontation Clause is on individual witnesses. Accordingly, the focus of the prejudice inquiry in determining whether the confrontation right has been violated must be on the particular witness, not on the outcome of the entire trial. *It would be a contradiction in terms to conclude that a defendant denied any opportunity to cross-examine the witnesses against him nonetheless had been afforded his right to "confront[ation]" because use of that right would not have affected the jury's verdict.* We think that a criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby "to expose to the jury the facts from which jurors ... could appropriately draw inferences relating to the reliability of the witness." *Davis v. Alaska* [415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347], [citation omitted]. Respondent has met that burden here: A reasonable jury might have received a significantly different impression of Fleetwood's credibility had respondent's counsel been permitted to pursue his proposed line of cross-examination.[3]

*Van Arsdall*, 106 S.Ct. at 1435–1436.

After finding a violation of the Confrontation Clause, the Court turned to whether such a violation was *per se* reversible error or whether the violation was subject to a harmless error analysis. The Court determined that, like other federal constitutional errors, a violation of the Confrontation Clause is subject to a harmless error analysis. *Van Arsdall*, 106 S.Ct. at 1438.

**3.** Unless otherwise indicated, all emphasis herein is supplied by author.

However, since a violation of the right to cross-examination under the Confrontation Clause necessarily means the testimony was not permitted before the fact finder, the Court was called upon to develop a harmless error analysis where evidence had been excluded. The Court established a three prong analysis for reviewing courts. First, assume that the damaging potential of the cross-examination were fully realized. *Van Arsdall*, 106 S.Ct. at 1438. Second, with that assumption in mind, review the error in connection with the following factors:

1) The importance of the witness' testimony in the prosecution's case;

2) Whether the testimony was cumulative;

3) The presence or absence of evidence corroborating or contradicting the testimony of the witness on material points;

4) The extent of cross-examination otherwise permitted; and,

5) The overall strength of the prosecution's case.

*Van Arsdall*, 106 S.Ct. at 1438.

Finally, in light of the first two prongs, determine if the error was harmless beyond a reasonable doubt. *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967); *Van Arsdall*, 106 S.Ct. at 1438. The Supreme Court then remanded the case to the Delaware Supreme Court to perform a harmless error analysis.

## III. THE HARMLESS ERROR ANALYSIS BY THE COURT OF APPEALS

As previously noted, we found the trial court erred by improperly limiting the scope of appellant's cross-examination of

the complainant's mother and we remanded the case to the Court of Appeals to perform a harmless error analysis. Therefore, the first issue before us today is to determine whether the harmless error analysis performed by the Court of Appeals was correct. The Court of Appeals began its harmless error analysis correctly by relying on *Van Arsdall*. *Shelby v. State*, 800 S.W.2d at 585. The Court then listed *seven* factors "to be considered whether a rational trier of fact might have reached a different result." *Shelby*, 800 S.W.2d at 586. The Court of Appeals analyzed those seven factors in relation to the record and concluded the error made no contribution to appellant's conviction. *Shelby*, 800 S.W.2d at 587.

■ The analysis by the Court of Appeals is flawed in at least two respects. First, by considering the factors to determine whether the jury might have reached a "different result" is to employ the "outcome determinative" analysis expressly rejected by the Supreme Court. *Van Arsdall*, 106 S.Ct. at 1435. Second, the factors listed by the Court of Appeals and attributed to *Van Arsdall* are *not* the factors enumerated in *Van Arsdall*, 106 S.Ct. at 1438. Inexplicably, the Court of Appeals omitted one of the *Van Arsdall* factors (*see*, no. 4 above) and added three factors of unknown origin. *Shelby v. State*, 800 S.W.2d at 586.[4] Accordingly, we find the harmless error analysis performed by the Court of Appeals improper and expressly disavow that analysis.

## IV. OUR ANALYSIS

As this case involves an error in violation of the Sixth Amendment, we must perform the analysis set out in *Van Arsdall*.

Prior to our analysis a brief summary of the evidence admitted before the jury as

---

**4.** The Court of Appeals attributed the following seven factors to *Van Arsdall*. However, the factors underlined are not found in *Van Arsdall* and have no known origin.

1) The importance of the tainted evidence in the prosecution's case;
2) Whether such evidence was cumulative;
3) The presence or absence of corroborative or contradictory evidence;
4) *Whether a limiting or curative instruction was or could have been given;*
5) *The presence or absence of prosecutorial comments upon such evidence;*
6) *Whether the accused had prior encounters with the law;* and
7) *The overall strength of prosecution's case.*

well as the evidence improperly excluded is necessary.

## A. *The Facts.*

The indictment alleged the offense of aggravated sexual assault as follows:

> [Appellant] ... on or about May 17, 1985, did then and there unlawfully intentionally and knowingly cause the penetration of the anus of [Complainant] ... a person younger than fourteen years of age and not his spouse by placing his finger in the anus of the Complainant.

The State presented the testimony of four witnesses: the complainant's aunt, the complainant's mother, Officer Donna Crum and the complainant.

The complainant's aunt testified as follows. She was babysitting the complainant on Friday, May 17, 1985. The complainant was with his aunt the entire day except for when she took a bath.[5] After the bath, she noticed the complainant was missing. She went outside and found the complainant crying. The aunt testified that the complainant told her "[t]hat some man was trying to give him candies, and then he stated that he pulled down his pants." She and the complainant walked to the apartment where the offense allegedly occurred "to find out if [the complainant] was telling me [aunt] the truth." At that apartment a woman opened the door and "she said she didn't see nothing." The complainant took his aunt to another apartment but no one was present at that apartment. The aunt did not believe the complainant's allegations because she did not "think things like that could happen" and because the two were not apart "long [enough] for anything to happen like that." The aunt did not call the police or seek medical attention for the complainant. The complainant's father arrived home at approximately 5:30 p.m. and the aunt related the events of the day to

the father.[6] The aunt then left to spend the weekend in Galveston.

The complainant's mother testified that she left her home at the Gardenview Apartments at 7:30 a.m. on Friday, May 17, 1985. When she returned that evening between 6:30 and 7:00 p.m., her son, the complainant, ran to her, hugged her, started crying, and related the following: "the man that cleans the pools, he took me to an apartment and he tied my hands and he covered my mouth and he took my clothes off and my pants and he pulled them and he started touching me in my private parts." The complainant's description of the "touching" included the penetration of the complainant's anus by "the man's" finger.

The complainant's mother examined the complainant on May 17, 1985 and saw what "looked like a little bit of blood" but it may have been the complainant's dirty underwear. The complainant was later taken to two doctors. The first doctor told the complainant's mother that there was nothing sexually wrong with the complainant. The second doctor advised her that nothing was physically wrong with the complainant. However, she also testified that the second doctor informed her that there had been penetration to the complainant's anus.[7]

On Saturday, May 18, 1987, the complainant led his mother to apartment number 203 where the complainant said the assault allegedly occurred.

The complainant's mother testified on cross-examination that while the complainant had never told her a lie, and that the complainant never "imagine[d] things" she did not believe the complainant's "outcry" because "it sounded kind of strange."

Officer Donna Crum of the juvenile sex crimes division of the Houston Police Department established the predicate necessary for the admission of the videotaped interview with the complainant. The videotaped interview was presented to the jury.

---

5. The record is not clear on the time the aunt took her bath. On direct examination she testified to taking the bath between 12:30 and 1:00 p.m. and that the bath took approximately forty minutes. However, on cross-examination she testified that she began her bath between 11:00 and 11:30 a.m. and finished at 12:30 p.m.

6. *The complainant's father did not testify.*

7. No independent medical evidence was offered by the State.

The complainant was called as the final witness for the State. The State's questioning of the complainant was limited to his identification of appellant. The complainant was then cross-examined by appellant. The State summarizes the complainant's testimony as follows: "The victim identified the appellant in open court as the man who touched him." The State then sets forth selected questions and answers from the cross-examination of the complainant and concludes, "[w]hile it is true that [the complainant's] testimony was not uncontradictory, he was a child of very tender years with limited understanding, and it is to be expected that his answers would at times be conflicting." State's Brief on Discretionary Review Following Remand, pgs. 6–9.

The State rested its case after the complainant's testimony and appellant offered the defensive testimony which the State describes as follows:

For the defense, Gracie Calvillo, resident manager of Gardenview Apartments where this offense occurred, testified that she was so employed in May, 1985. Ms. Calvillo identified the appellant in court as one of the groundskeepers at the apartment complex, and testified that he was working in that capacity in May, 1985.

On cross-examination, Ms. Calvillo testified that the appellant worked on May 17, 1985. She further stated that the appellant lived in apartment No. 9 across the street from the Gardenview Apartments office.

Mr. Paul Lloyd testified that in May, 1985, he was working at the Gardenview Apartments as a groundskeeper. He further testified that the appellant was also employed as a groundskeeper for the apartments and that sometimes they worked together. Mr. Lloyd recalled that on May 17, 1985, the appellant helped him change the lock on his apartment which was No. 32 at the Gardenview Apartments. They were finished at approximately 12:15 or 12:20, at which time the appellant left, walking toward his apartment. Mr. Lloyd stated that he saw the appellant again at 12:30 or 12:35

and they walked to the apartment office together.

Mrs. Jennifer O'Neal testified that in May, 1985, she was living in the Gardenview Apartments in Houston. Mrs. O'Neal further testified that on May 17, 1985, she saw the appellant and Paul Lloyd changing the lock on Paul's door between 12:00 and 12:30.

Mrs. Bernice Colbert testified that since April, 1985, she had lived in apartment No. 203 at 2121 Pech Road. This is the address of the Gardenview Apartments.

State's Appellate Brief, pgs. 4–5. (Citations to the record have been deleted by the author.)

### B. *The Excluded Testimony Showing Possible Bias.*

During the cross-examination of the complainant's mother, the following exchange occurred:

Q. [Complainant's mother], do you have any motive other than wanting to see justice fulfilled in pursuing this lawsuit against Perry Shelby?

THE STATE: I object to the questions, improper impeachment and improper cross-examination.

THE COURT: Sustained.

Q. Who is Robert Cattanach?

A. My attorney.

Q. What case does Mr. Cattanach represent you in?

THE STATE: I object to this question, Your Honor. May we approach the bench.

THE COURT: Sustained to objection. You may approach the bench.

(Whereupon, an off the record discussion was had.)

DEFENSE COUNSEL: [Complainant's mother], isn't it true that you have a one hundred twenty five thousand dollar lawsuit filed against Perry Joe Shelby?

THE STATE: I object as being irrelevant.

THE COURT: Sustained.

COMPLAINANT'S MOTHER: No, it isn't.

THE STATE: I ask for the last response to be stricken.

THE COURT: The last response of the witness will be stricken. I told you to wait and I mean it.

DEFENSE COUNSEL: Is it true, [complainant's mother], that you have a one hundred twenty five thousand dollar lawsuit pending against Taggert Investment or the apartment complex?

THE STATE: I object to that question as being irrelevant, your Honor.

THE COURT: Sustained.

The jury was later removed and the following was developed for the purposes of the record.

DEFENSE COUNSEL: This is concerning another issue. This is concerning testimony previously objected to and sustained by the Court in which I attempted to question the witness on her motive or bias for bringing this lawsuit.

I think that I know to be a fact that the witness has filed a one hundred twenty five thousand dollar lawsuit against the defendant Perry Joe Shelby and Taggert Investment Corporation the owner or owners of the apartment complex.

I think that evidence is material to the motive that this witness has for bringing this lawsuit against Perry Joe Shelby. And I think that evidence should be admissible in this lawsuit to impeach the witness and to attack her credibility in this matter.

We respectfully ask the Court to allow us to get into that line of questioning.

THE STATE: Your Honor, if I may ask this witness some questions that might be dispositive of that issue before the Court right now.

THE COURT: Okay.

THE STATE: [Complainant's mother], are you now involved in a lawsuit against the apartment complex where you used to live?

COMPLAINANT'S MOTHER: Yes, I am.

THE STATE: Did ,you file that lawsuit after you made the police report on that Monday or Sunday night when you called the police?

COMPLAINANT'S MOTHER: After.

THE STATE: How much after?

COMPLAINANT'S MOTHER: About two months after.

THE STATE: Your Honor, I respectfully move that any sort of mention of this lawsuit would be immaterial, flammatory (sic) and immaterial.

THE COURT: In response to that question, he asked a two fold question and it was sustained, the question you have asked.

DEFENSE COUNSEL: I'm sorry?

THE COURT: Sustain the question. I don't think it's material, counsel.

DEFENSE COUNSEL: Thank you, your Honor.

THE COURT: Bring the jury in.[8]

## C. *The Analysis.*

■ Under *Van Arsdall* we must focus on the testimony of the complainant's mother and assume that the damaging potential of the cross-examination was fully realized. In other words, we must assume the jury was fully informed of the lawsuit filed by the complainant's mother seeking $125,000.00 from the owners of the apartment complex as a result of the alleged offense and apply the following five factors:

1. The Importance of the Witness' Testimony in the Prosecution's Case;

The testimony of the complainant's mother was obviously important to the prosecution's case. She was the designated "outcry" witness for the State. As such she

---

8. During the closing arguments the State argued as follows:

... Who's in the best position to judge [the complainant's] credibility but his mother.

... *And you heard no evidence that she has any bias or prejudice towards this defendant. No evidence whatsoever. None of that, no kind of evidence like that was brought out by the defense.*

She, I submit to you, is motivated by one thing and one thing only, she wants justice for her son. She depends on you, ladies and gentlemen of the jury, to give her some of that justice.

was permitted to relate to the jury the statements made by the complainant on the date of the offense. The statements support the allegations in the indictment and are different from the statements made by the complainant to his aunt. Additionally, the complainant's mother testified to seeing blood on the complainant's underwear and to a medical opinion that the complainant's anus had been penetrated. Finally, the complainant's mother identified the apartment where the alleged offense occurred as number 203.

2. Whether the Testimony Was Cumulative;

The testimony of the complainant's mother was cumulative in some regards. However, "outcry" testimony is necessarily cumulative of a complainant's testimony. Tex.Code Crim.Proc.Ann. art. 38.072. However, the testimony of the complainant's mother was not cumulative in relation to several facts, namely, the blood found on the complainant's underwear, the medical opinion supporting penetration, and the number of the apartment where the assault allegedly occurred.

3. The Presence or Absence of Evidence Corroborating or Contradicting the Testimony of the Witness on Material Points;

Appellant offered an alibi defense which contradicted the "outcry" statement made by the complainant to his mother.

4. The Extent of Cross–Examination Otherwise Permitted;

Appellant was otherwise permitted to fully cross-examine the complainant's mother.

5. The Overall Strength of the Prosecution's Case.

The prosecution's case must be considered weak in light of the testimony of the complainant's aunt which reflects that she did not believe the complainant's allegations coupled with the fact that when the complainant led her to the apartment where the offense allegedly occurred, the woman at that apartment denied any

knowledge of the offense. Secondly, the testimony of the child, as the State readily admits, was contradictory. Finally, appellant offered an alibi defense that placed him with others at a different location when the alleged offense occurred. Overall, the State's case was very weak.

The final step of the analysis requires us to determine, in light of the foregoing examination, whether the error was harmless beyond a reasonable doubt. *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967). Focusing on the testimony of the complainant's mother and assuming that the jury was fully informed of the lawsuit she filed seeking $125,000.00 from the owners of the apartment complex, coupled with the importance of her "outcry" testimony, her testimony regarding the blood found on the complainant's underwear, and the medical opinion regarding penetration and the overall weakness of the State's case without her testimony, we cannot conclude beyond a reasonable doubt that the denial of the appellant's fundamental right to cross-examination guaranteed by the Confrontation Clause of the Sixth Amendment was harmless.[9]

The judgment of the Court of Appeals is reversed and the cause is remanded to the trial court for proceedings consistent with this opinion.

McCORMICK, P.J., and BENAVIDES, J., concur in the result.

CAMPBELL, J., being not at all confident that the Supreme Court has abandoned an "outcome determinative" approach to its harmless error jurisprudence, concurs in the result only. See, generally, *Cook v. State*, 1991 WL 237904 (Tex.Cr. App. No. 63,643, delivered September 18, 1991) (CAMPBELL, J., concurring).

WHITE, J., joins CÁMPBELL, J., note.

---

**9.** Having determined that the Sixth and Fourteenth Amendments have been violated, we will

not address the error in light of the Texas Constitution.