Court Of Appeals
Fourth Court of Appeals District of Texas
San Antonio


★ ★ ★       ★ ★ ★



# MEMORANDUM OPINION

No. 04-09-00406-CR

Guadalupe Espino **DIAZ**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 175th Judicial District Court, Bexar County, Texas
Trial Court No. 2009-CR-5043A
Honorable Mary D. Román, Judge Presiding

Opinion by:    Sandee Bryan Marion, Justice

Sitting:      Sandee Bryan Marion, Justice
           Phylis J. Speedlin, Justice
           Marialyn Barnard, Justice

Delivered and Filed:    June 9, 2010

AFFIRMED

A jury found appellant, Guadalupe Diaz, guilty of aggravated robbery against Kenneth Noble and aggravated robbery against Recole Chew. The trial court assessed punishment at forty-five years' confinement. In a single issue on appeal, appellant asserts the trial court improperly limited his right to cross-examine the two complainants about the relationship he had with them prior to the robbery. We affirm.

## RIGHT OF CONFRONTATION

During appellant's trial, Kenneth Noble, one of the complainants, had criminal charges pending against him for his part in the aggravated kidnaping of appellant's fiancé. The kidnaping occurred after the robbery. At trial, appellant attempted to cross-examine Noble about the facts underlying the kidnaping charge, but the trial court only allowed appellant to question Noble about whether such charges in fact were pending and whether the State had entered into any deal with Noble for his testimony at appellant's trial. Appellant also attempted to cross-examine Chew and Noble about the fact that Noble was a drug dealer who had an on-going relationship with appellant, on the defensive theory that the robbery was not a home invasion, but instead, was the result of a drug deal gone bad. The trial court refused to allow appellant to engage in this line of questioning.

"The right of cross-examination by the accused of a testifying State's witness includes the right to impeach the witness with relevant evidence that might reflect bias, interest, prejudice, inconsistent statements, traits of character affecting credibility, or evidence that might go to any impairment or disability affecting the witness's credibility." *Virts v. State*, 739 S.W.2d 25, 29 (Tex. Crim. App. 1987). We ultimately conclude appellant was not harmed by the trial court's refusal to allow appellant to pursue his line of cross-examination, even if the trial court erred.

## HARM ANALYSIS

Any error that improperly limits the right to confrontation, including the constitutional right to cross-examination, is subject to a harmless error analysis. In *Shelby v. State*, the Court of Criminal Appeals adopted the following analysis to be done when evidence has been excluded via the erroneous limitation of cross-examination. 819 S.W.2d 544, 547 (Tex. Crim. App. 1991) (adopting analysis first articulated in *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986)). First,

assume the damaging potential of the cross-examination was fully realized. *Shelby*, 819 S.W.2d at 547. Second, with that assumption in mind, review the error in connection with the following factors: (1) the importance of the witness' testimony in the prosecution's case; (2) whether the testimony was cumulative; (3) the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points; (4) the extent of cross-examination otherwise permitted; and (5) the overall strength of the prosecution's case. Finally, in light of the first two prongs, determine if the error was harmless beyond a reasonable doubt. *Id.* To perform this analysis, we must review the facts of this case and the excluded evidence.

### 1. Facts of this case

Chew testified she and Noble were asleep in their apartment when, at around 9:00 a.m., she heard the sound of breaking glass in the dining room. Believing someone had broken into the apartment, she awakened Noble just as a man wearing a red sweatshirt and carrying a handgun walked to the door of their bedroom. The man told Chew and Noble to get out of bed, go into the living room, and lay down. As they walked into the living room, the man held the gun to Chew's head. Once they were in the living room, the man opened the front door and three other men, one of whom was appellant, walked into the apartment. The man wearing the red sweatshirt asked her and Noble to tell the men the location of their money and jewelry. She said Noble looked at appellant and asked "is this how it is?" Appellant responded, "yes, this is how it is." Appellant then went to their bedroom and starting getting their clothes and shoes, while the other men started "loading stuff out too." At some point, the man in the red sweatshirt handed his gun to appellant, who held the gun over Chew and Noble. Chew and Noble were then told to go into the bathroom. Chew said the man in the red sweatshirt and appellant told her and Noble that because they knew

the men, "it was dying time." While in the bathroom, Chew overheard the men discussing needing the keys to a car because their own car would not start. When they heard the men leave, Noble went upstairs to his mother's apartment, got one of his guns, and went outside. Chew heard about four gunshots. Chew said their bed was flipped over, drawers were taken out of the bureau, closets were emptied, and the dining room table was flipped over.

Noble testified to the same sequence of events as did Chew. Noble described his initial reaction to appellant's appearance in his apartment as follows: "At that point, they come, and when I recognized [appellant], I asked [him], I'm like, is this how it is, you know, yeah, Peg Boy, that's how it is, you know what I'm saying, give them what they want." Later, after the police arrived, Noble and Chew were taken in a police car to identify a suspect stopped near their apartment, whom they identified as appellant.

### 2. Excluded testimony

At a bench conference, appellant's attorney argued Noble kidnaped appellant's fiancé in retaliation for the burglary, which was relevant to the alleged on-going dispute between the two men. Appellant's attorney also argued Noble was a drug dealer, something went wrong with the deal he had with appellant, and what transpired in the apartment was in connection with the drug deal gone bad.

### 3. *Van Arsdall* analysis

We first focus on Noble's testimony and assume that the damaging potential of the cross-examination was fully realized. In other words, we must assume the jury was fully informed of the facts underlying the alleged kidnaping and underlying any relationship between appellant and Noble with regard to drug deals. We then apply the five factors.

Although Noble was one of the complainants, his testimony was cumulative of Chew's testimony and there was other evidence corroborating Noble's testimony. In addition to Noble's and Chew's testimony about what happened, two of Noble's sisters also testified to appellant's involvement in the robbery. Shaqueida Noble testified she lived with her mother, sister, and another brother in an apartment above Chew and Noble's apartment. On the morning of the robbery, she walked outside where she encountered appellant who pulled out a gun, put it to her head, and told her to go back inside to Chew and Noble's apartment. She was forced to go into the bathroom, where she saw Chew, Noble, and her younger sister, LaToya. One of the men said "if we come out they would kill us or if we were to say anything." Once everything became quiet, she and Chew left the bathroom. The next sound she heard was that of gunshots. At some point after the police arrived, Shaqueida and her mother were driven, in a police car, to a location where a suspect had been stopped. Shaqueida identified the man as appellant. Shaquieda also testified she had, on previous occasions, seen her brother and appellant talking.

Noble's other sister, LaToya, testified she was upstairs in her apartment when she heard noises coming from her brother's apartment. She went downstairs, saw the door to his apartment open, and walked in. She saw her brother in the hall with his hands up. When her brother told her to leave, LaToya turned around and saw appellant. She said appellant held a gun to her and patted her down, asking if she had a cell phone. He then opened the bathroom door and told her to go inside with her brother and Chew. A few minutes later, her sister Shaquieda came into the bathroom. She said the men asked for car keys. When the apartment became quiet, she and her brother walked out of the bathroom together, at which point her brother went upstairs to get a gun. LaToya said her

brother and the men exchanged gun fire. LaToya also was taken in a police car to identify a suspect, whom she identified as appellant.

On cross-examination of Noble, Noble stated he knew appellant "through a friend" and he admitted appellant had been to his apartment numerous times. But he denied there was any dispute between himself and appellant "as to money that was owed." Noble said he had owned his gun for two or three months, and left it in his mother's apartment when he moved into the downstairs apartment. He admitted he had not worked for about one year prior to the robbery, but he owned two vehicles, one of which had "real nice rims." He admitted getting robbed and shot at made him angry and he wanted people punished. However, Noble admitted he signed an affidavit asking the State to drop the robbery charges against appellant because Noble, who was incarcerated at the time, did not want to be known as a snitch. Defense counsel then asked Noble the following question:

> Q. Isn't it true, Kenneth, that what actually happened that day, there was a dispute over money and along with other people, [appellant] went there to collect? Isn't that what really happened? Isn't that why you signed that affidavit trying to get these cases dismissed, because you know that's the truth?
>
> A. No. That's not true.

Our review of the record reveals defense counsel was otherwise able to cross-examine Noble, who testified while wearing an orange Bexar County jail jumpsuit. And, although counsel was prevented from exploring the possibility that Noble was involved with appellant in drug deals and counsel was prevented from delving into the details of the aggravated kidnaping charge against him, counsel's cross-examination placed before the jury the fact that Noble was unemployed but owned two vehicles and he knew appellant and interacted with him often. Defense counsel also raised the suspicion that a dispute over money may have existed between appellant and Noble.

**CONCLUSION**

In light of the foregoing analysis, we conclude the trial court's error was harmless beyond a reasonable doubt. Accordingly, we overrule appellant's issue on appeal and affirm the trial court's judgment.

Sandee Bryan Marion, Justice

DO NOT PUBLISH