**Affirmed and Opinion Filed August 9, 2013.**



In The

**Court of Appeals**

**Fifth District of Texas at Dallas**

**No. 05-12-00667-CR**

**JOSE LUIS COVARRUBIAS, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 283rd Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. F11-00784-T**

## OPINION

Before Justices Lang, Myers, and Evans
Opinion by Justice Lang

Jose Luis Covarrubias appeals the trial court's judgment convicting him of murder. The jury found Covarrubias guilty, that he used a deadly weapon during the commission of the offense, and assessed his punishment at seventy-five years of imprisonment. Covarrubias raises five issues that argue three points: (1) the trial court erred when it denied his motion to dismiss the indictment because the deportation of Gladys Hernandez, a defense witness, violated his constitutional rights to compulsory process, due process, and present a defense; (2) the trial court erred when it limited his right to cross-examine Detective Scott Sayers, violating his constitutional right to confront the witnesses against him; and (3) he suffered egregious harm when the trial court included an instruction in the jury charge that authorized the jury to convict him of felony murder if they found that he committed misdemeanor deadly conduct.

We conclude that, even if Covarrubias's constitutional rights to compulsory process, due process, present a defense, and confront the witnesses against him were violated, Covarrubias has not shown that he was harmed by the errors. Also, we conclude that, even though the trial court included an instruction in the jury charge that authorized the jury to convict him of felony murder if they found that he committed misdemeanor deadly conduct, Covarrubias has not shown that he suffered egregious harm. The trial court's judgment is affirmed.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On April 13, 2010, Covarrubias purchased a Saiga 12-guage shotgun and two boxes of 12-guage 00 buckshot from a sporting goods store. He also purchased an extra detachable 12-round magazine as the factory magazine held only five rounds.

Covarrubias's "significant other" was Gladys Hernandez. Hernandez drove a black, Mitsubishi Montero, and lived with her children and cousin Abraham Vega. On the night of April 18, 2010, Hernandez told Vega that she was going to "the club" with Covarrubias.

At an after-hours club called XTC, Jessica Ybarra and her cousin, Venessa Gutierrez, saw Jaime Barrera with Covarrubias and Hernandez. When they first arrived, Ybarra saw Covarrubias near a black sport utility vehicle. While they were in the club, Covarrubias approached Ybarra and asked her to get his girlfriend, Hernandez, out of the restroom. Ybarra found Hernandez vomiting in the restroom and told the security guard. Also, two fights occurred in the club.

After Ybarra and Gutierrez left the club, Barrera called Ybarra's mobile phone and Gutierrez answered. Barrera told them to drive to the "other side of the parking lot." When they arrived Barrera was in his "baby blue" Lincoln and screamed through the window that "Whoever standing [sic] in valet, if y'all know them, go and tell them to move." When Ybarra asked why, Barerra said "[my cousin or homeboy] has my gun and he's drunk and he's crazy." Ybarra and

Gutierrez understood him to be referring to Covarrubias. Gutierrez went to warn people, while Ybarra waited in the car. Then, Ybarra heard five or six gunshots. Gutierrez ran back to the car and Ybarra drove off.

Bashir Abraham worked as a taxicab driver. On April 19, 2010, in the early morning hours, he picked up two passengers, Fidel Retana and Ezequiel Vasquez, at XTC. While the taxicab was stopped at a red light, Retana heard gunshots and felt something burning in the back of his head, and Vasquez screamed that he had been shot. Retana saw a black Mitsubishi Montero. He did not see any other vehicles nearby at that time. Retana yelled at the taxicab driver to "go," but Abraham was slumped over and did not respond. Retana got out of the taxicab and opened the driver's door. Abraham fell onto Retana, who saw that Abraham had a large hole in the back of his head. Retana and Vasquez left Abraham on the road, believing he was dead, and drove to the hospital. While en route, they called 9-1-1, reported what had happened, and explained there was another victim on the road.

Ana Corona was working at a Whataburger when she heard three to five gunshots. She saw the taxicab driver being pulled out of the driver's seat and called 9-1-1. Also, Corona saw two other vehicles, one a black four-door car, pass by and then, turn right. After the taxicab drove away, Corona saw two additional vehicles stop to render aid to the taxicab driver.

After Ybarra and Gutierrez left XTC, Barrera called Gutierrez again and told her "Man, my cousin just shot up the taxi, the taxicab," and "They just threw somebody out." Gutierrez told Ybarra to drive to the Whataburger. Barrera was still on the telephone with Gutierrez when Ybarra and Gutierrez saw a body on the ground. Ybarra and Gutierrez got out of the car to see if they could help, but a person later identified as Allen Runnels had already stopped. After the police arrived, Barrera called again and asked Gutierrez, "[W]hy are you talking to the cops? Don't tell them nothing about this." Gutierrez hung up on Barrera. Officer Stephen Baldwin

–3–

spoke with Gutierrez, who told him that Barerra's friend had "aired out" the taxicab. Officer Baldwin understood this to mean that Barerra's friend had "shot the vehicle up." The police took Ybarra and Gutierrez to the police station for further questioning.

Around 5:00 a.m. on April 19, 2010, Adela Flores heard her boyfriend, Barrera, return home. Barrera was talking to Covarrubias on the phone and Flores heard Covarrubias tell Barrera that "he didn't want [Barrera] to say anything that happened because if he did say anything, that he was going to turn around and blame [Barrera] for it." A while later, Covarrubias arrived at Flores's house. After speaking with Barrera privately in another room, Covarrubias left. Jose Alvarado was also at Flores's house. After Covarrubias left, Barerra re-entered the room with a shotgun. Barerra asked Alvarado to help him wipe the shotgun down, wrap it in towels and "Saran Wrap," and bury it in the backyard. Then, Barrera burned a bag of clothes. Alvarado and Barerra could see Covarrubias's house from Flores's house. They watched as the police approached Covarrubias's house, but Covarrubias was not there. Then, the police came to Flores's house and spoke to Barerra. Afterward, Barerra and Alvarado dug up the shotgun. At some point Flores went to her deceased father's truck to retrieve something and found the shotgun in the back of the truck. Flores contacted Detective Scott Sayers. Afterward, Flores and Barerra took the shotgun to the office of Barerra's attorney where Detective Sayers collected the shotgun.

On the morning of April 19, 2010, Vega saw Hernandez in her room with Covarrubias. Covarrubias had a large bump and bruise on his face. Covarrubias used Vega's laptop computer to view a story about a shooting incident involving a Mitsubishi Montero on the Fox 4 News website. That same day, Jagmeet Hira, who worked with Covarrubias saw a news report about the shooting death of a taxicab driver. He thought Covarrubias might be involved because Covarrubais did not show up for work that day, Covarrubias had shown his co-workers a

shotgun, Hira recognized the vehicle described in the news report, he had seen Covarrubias drive Hernandez's Mitsubishi Montero, and Hira knew that Covarrubias frequented the XTC club. Hira called Covarrubias and "asked him what happened." According to Hira, Covarrubias told him "[h]e's in the club, got into a fight with some people. He waited for them outside. He followed them and he thought—he presumed they were in that cab and he shot into the cab." Covarrubias also told Hira that Hernandez was passed out in the car at the time of the shooting. Covarrubias stated that he drove off before he could see what really happened. Further, Covarrubias asked Hira what he should do. Hira responded that Covarrubias could either turn himself in or run.

On the night of April 19, 2010, Hernandez asked Vega to make arrangements for Hernandez, her children, and Covarrubias to stay in a hotel in Lewisville, Texas. Vega drove them to the hotel in his car. The next morning, Vega awakened in the apartment and heard Hernandez and Covarrubias running around the apartment and "telling each other to get things." Vega went back to sleep. When he awakened for the second time, he went into Hernandez's room and saw that all of her clothes were gone, but the Montero was still in the parking lot. Later, Vega took his car to get it washed and upon his return, he was stopped by the police who were looking for Covarrubias and Hernandez.

A month after the shooting, Vega met with Detective Sayers. Vega told Detective Sayers that he had learned through family members that Hernandez and Covarrubias were in Mexico. In May 2010, Covarrubias was apprehended in Mexicali, Mexico, by the U.S. Marshalls. Covarrubias was deported from Mexico and returned to the United States.

On December 13, 2010, defense counsel learned from Covarrubias's father that Hernandez had recently returned to the United States. Hernandez scheduled an appointment with defense counsel on December 20, 2010, but arrived an hour and half late. As a result, defense

counsel was unable to complete her interview and a second interview was scheduled for the following day.  The next morning, Hernandez called defense counsel's office and reported that a detective wanted to speak with her.  Later that day, Hernandez met with defense counsel for a second interview.

On December 20, 2010, Detective Sayers received an anonymous telephone call informing him of the location of Hernandez, who had returned to the United States.  On December 21, 2010, Detective Sayers met with Hernandez who told him that she passed out drunk at the XTC Club, did not wake up until later that morning, so she did not know what happened that night.  This was consistent with the information he had received from other witnesses.  However, Hernandez did say that Covarrubias did not have the shotgun because several hours before the shooting, Covarrubias had given it to Barerra at a different club.  Hernandez also stated that during the months they were in Mexico, Covarrubias did not tell her what happened.  Detective Sayers asked Hernandez if she was still dealing with immigration issues and Hernandez responded "Yes."  When he returned to the office, Detective Sayers called Agent Tony Jasso of Homeland Security to inquire about Hernandez's immigration status.  Agent Jasso asked for Hernandez's address and Detective Sayers gave it to him.

After Agent Jasso interviewed Hernandez, he notified Detective Sayers that he had passed the case to Deportation Officer John Murphy of U.S. Immigration and Customs Enforcement (ICE), who was already working on Hernandez's case.  Hernandez had removed her ankle monitor when she fled to Mexico with Covarrubias and an order for her removal had been rendered by an immigration judge.  As a result, Deportation Officer Murphy had been conducting surveillance on Hernandez's residence for three weeks.  ICE arrested Hernandez.

At the request of Agent Jasso, Deportation Officer Murphy called Detective Sayers, told him that Hernandez was in custody, and asked if Hernandez was going to be used as a witness.

Detective Sayers responded that he did not need anything else from Hernandez because she claimed that she did not see anything, was drunk, and passed out in the car. Also, she had refused to provide a statement. Then, Deportation Officer Murphy spoke with an assistant district attorney working on the Covarrubias prosecution who told him that the District Attorney's Office was not trying to persuade the federal government whether or not to proceed with Hernandez's deportation. After communicating with Detective Sayers and the assistant district attorney, Deportation Officer Murphy received a telephone call from Covarrubias's attorney who stated that Hernandez was a witness in a murder trial and a writ of attachment "was on its way." However, that writ of attachment was never served by the Sheriff's Department. Then, the assistant district attorney sent Deportation Officer Murphy an e-mail stating, in part, the following:

> It has come to my attention that Gladys Hernandez is currently in ICE custody. According to [the] defense attorney, . . . Ms. Hernandez is a witness for the defense in a murder case against defendant, Jose Covarrubias, case number F10-54679. . . . [O]ur office is NOT asking that Ms. Hernandez be removed. If it is possible to hold off on deportation, that would be extremely helpful to sort out what has happened and to give the defense attorney an opportunity to have Ms. Hernandez held until trial.

On December 24, 2010, Hernandez was deported to Cuna, Mexico. Defense counsel's attempts to locate Hernandez for trial were unsuccessful.

Before trial, Covarrubias filed a motion to dismiss the indictment arguing his constitutional rights were violated as a result of the prosecution's collusion with ICE to have Hernandez deported. After a hearing, the trial court denied the motion. During the trial, Covarrubias re-urged his motion to dismiss and the trial court denied it. Also, outside the jury's presence, defense counsel proffered the testimony Hernandez would have provided if she had not been deported. Further, the trial court limited Covarrubias's cross-examination of Detective Sayers regarding any negative relationship between Covarrubias and Hira. The jury found

Covarrubias guilty, that he used a deadly weapon during the commission of the offense, and assessed his punishment at seventy-five years of imprisonment.

## II. CONSITUTIONAL ERROR

In issues one through three, Covarrubias argues the trial court erred when it denied his motion to dismiss the indictment because Hernandez's deportation violated his constitutional rights to compulsory process, due process, and present a defense. In issue four, Covarrubias argues the trial court erred when it limited his right to cross-examine Detective Sayers, violating his constitutional right to confront the witnesses against him.

### A. Harm Analysis

Under Rule 44.2(a) of the Texas Rules of Appellate Procedure, constitutional error that is subject to a harmless error review requires reversal unless the court determines beyond a reasonable doubt that the error did not contribute to the conviction or punishment. TEX. R. APP. P. 44.2(a). When determining whether the error was harmful, an appellate court considers a non-exclusive list of factors to the extent they are relevant: the nature of the error, to what extent it was emphasized by the State, probable collateral implications of the error, and the weight a juror probably would place on the error. *See Snowden v. State*, 353 S.W.3d 815, 819–20, 821–22 (Tex. Crim. App. 2011). An appellate court "calculate[s], as nearly as possible, the probable impact of the error on the jury in light of the other evidence. The error was not harmless if there is a reasonable likelihood that it materially affected the jury's deliberations." *Neal v. State*, 256 S.W.3d 264, 284 (Tex. Crim. App. 2008) (internal quotations omitted).

### B. Deportation of Hernandez

In order for us to reverse Covarrubias's conviction, we must decide both that the trial court erred when it denied Covarrubias's motion to dismiss the indictment and any error by the trial court materially affected the jury's deliberations. *See U.S. v. Valenzuela-Bernal*, 458 U.S.

858, 873 (1982). Covarrubias argues he was harmed by these errors because the State's case hinged on a tenuous inference that because he was linked to the car and shotgun involved in the shooting, he was the shooter. He claims the record is devoid of overwhelming evidence to support the jury's finding and Hernandez's alleged exculpatory testimony would have created reasonable doubt as to his involvement in the murder. Also, Covarrubias contends that once Hernandez was deported, there was no way to locate her so he suffered irreparable harm. The State responds that Hernandez's alleged testimony is an unlikely alternative hypothesis and has gaps.

The record shows that outside the presence of the jury, defense counsel proffered the testimony Hernandez would have provided through the testimony of defense counsel's office manager, Yasmin Diaz, Hernandez's friend, Edwin Medina, and Detective Sayers. From this testimony, Covarrubias contends that Hernandez's specific testimony would have been as follows: (1) she was with Covarrubias on the night of the shooting; (2) Covarrubias told Barerra about the shotgun he purchased; (3) Hernandez and Covarrubias went inside the first club while Barerra stayed in his car with the shotgun; (4) Hernandez and Covarrubias went to XTC and Barerra arrived later in his own vehicle; (5) when Barrera arrived at XTC, he told Covarrubias he had the shotgun; (6) the shotgun remained in Barerra's car when they went into XTC; (7) Covarrubias escorted Hernandez to her car, but he went back into XTC; (8) Hernandez slept in the car while Covarrubias was inside XTC; (9) when Covarrubias returned to the car, she heard him open the door; (10) Hernandez believes she would have known if Covarrubias had shot someone; and (11) Hernandez never saw Barerra return the shotgun to Covarrubias. Covarrubias's counsel argued to the trial court that

> The whole purpose of [Covarrubias's] motion to dismiss the indictment was based on [Hernandez] being able to testify and put the [shot]gun in the hands of another person prior to the shooting which was very key and then stuff afterwards. There are some other witnesses afterwards that can fill in some pieces of it, not

–9–

completely. The damage, though, to not placing the [shot]gun in someone else's hands just prior to the shooting is key to our case.

Even assuming Hernandez's testimony would have stated what is outlined above, that testimony would demonstrate only that Hernandez was "passed out" or "sleeping" in the car at the time of the shooting and Barerra had the shotgun at some point before Hernandez, Covarrubias, and Barerra went to the XTC club. Detective Sayers noted that Hernandez stated only that she did not see Barerra return the shotgun to Covarrubias. Further, the purported testimony of Hernandez would demonstrate that she was not continuously with Covarrubias that night because Hernandez stated she slept in the car while Covarrubias went back inside the club. Also, the alleged testimony of Hernandez did not include a statement that Barerra was the shooter. We conclude, on this record, that, even if Hernandez's testimony had been included at trial, it has not been shown that there is a reasonable likelihood it would have affected the judgment of the jury or the outcome of Covarrubias's trial. *See Valenzuela-Bernal*, 458 U.S. at 868, 874. Also, we conclude that Hernandez's testimony would not have created a reasonable doubt of Covarrubias's guilt that did not otherwise exist. *See White v. Estelle*, 685 F.2d 927, 928 (5th Cir. 1982) (per curiam).

Accordingly, we conclude, even if the trial court erred when it denied Covarrubias's motion to dismiss the indictment because Hernandez's deportation violated his constitutional rights to compulsory process, due process, and present a defense, Covarrubias has not shown that the error was harmful. Issues one, two, and three are decided against Covarrubias.

### C. Cross-examination of Detective Sayers

Covarrubias contends the trial court erred when it limited his right to cross-examine Detective Sayers, violating his constitutional right to confront the witnesses against him. Even if the trial court erred when it limited Covarrubias's cross-examination of Detective Sayers, Covarrubias must demonstrate that the error was harmful.

–10–

During cross-examination, defense counsel questioned Detective Sayers about his investigation into the relationships between employees at the wrecker company where Covarrubias and Hira worked. Defense counsel asserted she was attempting to develop that Hira was biased and had a motive to testify against Covarrubias.

Specifically, the following question was posed and objection lodged:

Defense Counsel: At any point in time did you learn that [Hira] was angry at [Covarrubias] because he was going into his territory? Did you learn that?

Prosecutor: I object to facts not in evidence.

Defense Counsel: It is in evidence, Your Honor, through another witness and it goes to motive.

Prosecutor: Improper impeachment.

Defense Counsel: And bias and lack of investigation, Your Honor.

Court: Sustained.

Covarrubias contends that Detective Sayers's testimony was critical to attack the State's case, it was not cumulative, "it was important for the jury to understand how [Detective Sayers] gathered evidence and focused on [Covarrubias] as the suspect," and the State's case was "not overwhelming given the lack of forensic evidence proving that [Covarrubias] was the shooter." The State responds Covarrubias was able to cross-examine Hira regarding any bias or motive he had to testify against Covarrubias. As a result, the State contends that the trial court's refusal to permit Covarrubias the extended scope of cross-examination of Detective Sayers regarding any negative relationship between Covarrubias and Hira was harmless.

The United States Supreme Court and the Texas Court of Criminal Appeals have explained that a harmless error analysis applies when a trial court improperly limits a defendant's cross-examination of a witness for the purpose of exposing the witness's bias. *See Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986); *Shelby v. State*, 819 S.W.2d 544, 546 (Tex. Crim. App.

–11–

1991); *see also* TEX. R. APP. P. 44.2(a). Under this analysis, an appellate court must first assume that the damaging potential of the cross-examination was fully realized, and then determine whether the error was harmless beyond a reasonable doubt in light of the following factors: (1) the importance of the witness's testimony in the prosecution's case, (2) whether the testimony was cumulative, (3) the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, (4) the extent of cross-examination otherwise permitted, and (5) the overall strength of the prosecution's case. *Shelby*, 819 S.W.2d at 547.

The parties do not dispute that Detective Sayers was an important witness in the prosecution's case. However, Detective Sayers's testimony relating to bias or motive on the part of Hira to testify against Covarrubias was cumulative because defense counsel was freely permitted to cross-examine Hira on this matter. During the questioning of Hira by defense counsel, Hira admitted that he and Covarrubias competed for work and he had "threatened [Covarrubias's] job." Hira denied that Covarrubias threatened to tell Hira's wife that he was unfaithful. Further, Hira acknowledged that, given their relationship, it did not make sense that Covarrubias confessed to him. Hira admitted that he worked with Barerra, but denied accusing Covarrubias in order to help Barerra. Also, Hira admitted to telling Covarrubias that he should flee to Mexico.

We conclude that, even if the trial court erred when it limited Covarrubias's cross-examination of Detective Sayers, Covarrubias has not shown that the error was harmful. *See Ho v. State*, 171 S.W.3d 295, 304 (Tex. App.—Houston [14th Dist.] 2005, pet. ref'd) (explaining that cross-examination may be limited to avoid cumulative or collateral evidence if the witness's possible bias and motive are already clear and the accused has otherwise been afforded an opportunity for a thorough cross-examination). Issue four is decided against Covarrubias.

## III.  JURY CHARGE ERROR

In issue five, Covarrubias argues he suffered egregious harm when the trial court included an instruction in the jury charge that authorized the jury to convict him of felony murder if they found that he committed misdemeanor deadly conduct.  He claims that the application paragraph of the jury charge incorrectly instructed the jury on the elements of the offense of murder under the State's felony murder theory, the weight of the evidence against him was not overwhelming, and during voir dire, the jury seemed confused by the prosecutor's explanation of the applicable law.  The State responds that Covarrubias did not suffer egregious harm because the record contains probative evidence of his guilt, the State's closing argument properly outlined the culpable mental states and limited them to the relevant conduct elements, and he did not contest the culpable mental state at trial.

### A.  Egregious Harm

Article 36.19 of the Texas Code of Criminal Procedure establishes the standard for reversal on appeal when the requirements of article 36.14, which relates to the charge of the court, have been disregarded: "the judgment shall not be reversed unless the error appearing from the record was calculated to injure the rights of [the] defendant, or unless it appears from the record that the defendant has not had a fair and impartial trial."  TEX. CODE CRIM. PROC. ANN. art. art. 36.19 (West 2006).  Under *Almanza*, jury charge error requires reversal of the judgment when the defendant has properly objected to the charge and the appellate court finds "some harm" to his rights.  *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984).  When the defendant fails to object or states that he has no objection to the jury charge, an appellate court will not reverse for jury charge error unless the record shows "egregious harm" to the defendant.  *Ngo v. State*, 175 S.W.3d 738, 743–44 (Tex. Crim. App. 2005).

Egregious harm is a difficult standard to prove and such a determination must be done on a case-by-case basis. *Hutch v. State*, 922 S.W.2d 166, 171 (Tex. Crim. App. 1996). The actual degree of harm must be assayed in light of: (1) the entire jury charge; (2) the state of the evidence; (3) the argument of counsel; and (4) any other relevant information revealed by the record of the trial as a whole. *Allen v. State*, 253 S.W.3d 260, 264 (Tex. Crim. App. 2008); *Almanza*, 686 S.W.2d at 171. Errors which result in egregious harm are those that affect the very basis of the case, deprive the defendant of a valuable right, vitally affect the defensive theory, or make a case for conviction clearly and significantly more persuasive. *E.g., Taylor v. State*, 332 S.W.3d 483, 490 (Tex. Crim. App. 2011).

### B. Application of the Law to the Facts

First, we examine the entire jury charge. *See Allen*, 253 S.W.3d at 264; *Almanza*, 686 S.W.2d at 171. Section 19.02(b) of the Texas Penal Code provides that a person commits murder if he:

(1) intentionally or knowingly causes the death of an individual;

(2) intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual; or

(3) commits or attempts to commit a felony, other than manslaughter, and in the course of and in furtherance of the commission or attempt, or in immediate flight from the commission or attempt, he commits or attempts to commit an act clearly dangerous to human life that causes the death of an individual.

TEX. PENAL CODE ANN. § 19.02(b) (West 2011). Deadly conduct is a third degree felony when a person "knowingly discharges a firearm at or in the direction of . . . one or more individuals." TEX. PENAL CODE ANN. § 22.05(b)(1), (e) (West 2011). However, deadly conduct is a class A misdemeanor when a person "recklessly engages in conduct that places another in imminent danger of serious bodily injury." TEX. PENAL CODE ANN. § 22.05(a), (e).

The jury charge defined deadly conduct as follows:

–14–

A person commits the offense of deadly conduct if he recklessly engages in conduct that places another in imminent danger of serious bodily injury, or if he knowingly discharges a firearm at or in the direction of one or more individuals or a vehicle and is reckless as to whether the vehicle is occupied.

The application paragraph of the jury charge states:

Now, bearing in mind the foregoing instructions, if you believe from the evidence beyond a reasonable doubt that the defendant, Jose Luis Covarrubias, on or about the 19th day of April, 2010, in the county of Dallas and [S]tate of Texas, did then and there with intent to cause serious bodily injury to an individual or individuals unknown to the grand jury, commit an act clearly dangerous to human life that caused the death of Bashir Abraham, an individual, by firing a firearm, a deadly weapon, into a vehicle, situated in a lane of traffic on a public roadway, then occupied by Bashir Abraham,

OR did intentionally or knowingly commit or attempt to commit the felony offense of deadly conduct, and while in the course of or in furtherance of the commission or attempt of said offense, or in immediate flight from the commission or attempt of said offense, did then and there commit or attempt to commit an act clearly dangerous to human life, to wit: shooting Bashir Abraham, an individual, with a firearm, a deadly weapon, and did thereby cause the death of Bashir Abraham you will find [Covarrubias] guilty of the offense of murder as charged in the indictment, and you will make no finding un your verdict as to punishment.

Neither the State nor Covarrubias objected to the trial court's jury charge.

The trial court's jury charge alleged two theories for the offense of murder. The definition of deadly conduct contained in the jury charge included both the misdemeanor and felony definitions of that offense. As a result, the application paragraph as it relates to the theory alleged pursuant to section 19.02(b)(3) of the Texas Penal Code, which requires the jury to find that Covarrubias committed or attempted to commit a felony offense, authorized the jury to convict him if they concluded he committed misdemeanor deadly conduct. However, the application paragraph did limit the relevant conduct to the "felony offense of deadly conduct." Further, the application paragraph also required the jury to find that he discharged a firearm, shooting Abraham and causing his death, which is part of the definition for the offense of felony deadly conduct. Discharging a firearm is not part of the misdemeanor deadly conduct offense.

–15–

Second, we review the state of the evidence. *See Allen*, 253 S.W.3d at 264; *Almanza*, 686 S.W.2d at 171. There is testimony in the record that Covarrubias admitted he committed the offense to Hira, and Barerra told Ybarra and Gutierrez that Covarrubias shot at the taxicab. In addition, Coavrrubias was linked to the shotgun and the vehicle seen at the time of the shooting. Further, following the offense, Covarrubias fled immediately to a motel and from there to Mexico.

Third, we review the argument of counsel. *See Allen*, 253 S.W.3d at 264; *Almanza*, 686 S.W.2d at 171. In its closing argument, the State outlined the culpable mental state for felony deadly conduct as follows:

> Go back to April 19th, 4:45, 4:50 in the morning, 4:40. [Covarrubias] rolls out in his black Mitsubishi Montero. He perceives that the individual he's trying to shoot, whether it be Big Al, whether it be [Retana], whoever he struggled with in the club, get in the [taxi]cab.
>
> He follows that cab up, loads this magazine in this [shot]gun, drives up about a half mile down the road, points this weapon out the window, holds it out the window. I don't know—we don't have to show you how he was holding the [shot]gun—and unloads multiple rounds in that [taxi]cab.
>
> . . . .
>
> What we're trying to do and prove to all of you is that the defendant is the one that unloaded this shotgun that night.
>
> . . . .
>
> What adds up here? This man right here Jose Covarrubias . . . buys a shotgun, gets thrown out of the club, gets pissed off at the people who he follows at the club and decides he's going to take the law in[to] his own hands.
>
> Whether he's blaming it on the goose [referring to Blue Goose alcohol], as he said, whether he's saying he just fucked up, he's going to take the shotgun he got and he's going to get the people that caused him to get thrown out of that club. Whether he knew he was shooting the right people or the wrong people, he took that shotgun and unloaded four or five shots in that taxicab, killing one, injuring two.

The State's closing argument focused on Covarrubias's discharge of a firearm, which pertains to the offense of felony deadly conduct. The State did not discuss whether Covarrubias's action

–16–

recklessly placed another in imminent danger of serious bodily injury, which pertains to the offense of misdemeanor deadly conduct.

Finally, we consider any other information revealed by the record of the trial as a whole. *See Allen*, 253 S.W.3d at 264; *Almanza*, 686 S.W.2d at 171. We note that the trial court's judgment contains a deadly weapon finding.

Even though the trial court included an instruction in the jury charge that authorized the jury to convict him of felony murder if they found that he committed misdemeanor deadly conduct, we conclude that Covarrubias has not shown that the error resulted in egregious harm. Issue five is decided against Covarrubias.

## IV. CONCLUSION

Even if Covarrubias's constitutional rights to compulsory process, due process, present a defense, and confront the witnesses against him were violated, Covarrubias has not shown that he was harmed by the errors. Also, even though the trial court included an instruction in the jury charge that authorized the jury to convict him of felony murder if they found that he committed misdemeanor deadly conduct, Covarrubias has not shown that he suffered egregious harm.

The trial court's judgment is affirmed.

/Douglas S. Lang/
DOUGLAS S. LANG
JUSTICE

Do Not Publish
TEX. R. APP. P. 47

120667F.U05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

JOSE LUIS COVARRUBIAS, Appellant

No. 05-12-00667-CR     V.

THE STATE OF TEXAS, Appellee

On Appeal from the 283rd Judicial District Court, Dallas County, Texas
Trial Court Cause No. F11-00784-T.
Opinion delivered by Justice Lang. Justices Myers and Evans participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 9th day of August, 2013.

/Douglas S. Lang/
DOUGLAS S. LANG
JUSTICE